965 A.2d 923

Timothy A. FREY, et al.

v.

## COMPTROLLER OF THE TREASURY.

No. 1360, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Feb. 26, 2009.

316

318

320

Harry D. Shapiro (Robert A. Spar, Saul Ewing, LLP on the brief), Baltimore, for Appellant.

John K. Barry (Gerald Langbaum, Douglas F. Gansler, Atty. Gen. on the brief), Baltimore, for Appellee.

Pnael: JAMES R. EYLER, ZARNOCH, ROBERT L. KARWACKI, (Ret., specially assigned), JJ.

ROBERT L. KARWACKI, Judge, (Ret., specially assigned).

In July 2005, the Maryland Comptroller of the Treasury, appellee, issued Notices of Income Tax Assessment to David S. Antzis and Judith W. Antzis ("the Antzises"), Timothy A. Frey and Mary S. Frey ("the Freys"), and Rudolph Garcia and Randi E. Pastor–Garcia ("the Garcias"), appellants, with respect to each of their joint Maryland Nonresident Tax Returns for the year ended December 31, 2004. Following an informal hearing before a hearing officer, the Antzises, Freys, and Garcias each received a Notice of Final Determination assessing them for failure to calculate the Special Nonresident Tax on their tax returns. Appellants were also assessed penalties and interest. They appealed to the Maryland Tax Court, where the cases were consolidated. The Tax Court affirmed the assessments but abated the penalties. Appellants petitioned for judicial review in the Circuit Court for Anne Arundel County. The circuit court affirmed the assessment of the Special Nonresident Tax against appellants, but remanded the case to the Maryland Tax Court for consideration of abatement of interest. Appellants noted a timely appeal to this Court and present the following issues for our review:

I. Whether the Special Nonresident Tax violates the Interstate Commerce Clause of the United States Constitution;

II. Whether the Special Nonresident Tax violates the Equal Protection Clause of the United States Constitution;

III. Whether the Special Nonresident Tax violates the Privileges and Immunities Clause of the United States Constitution;

IV. Whether the Special Nonresident Tax violates the Maryland Constitution and Declaration of Rights because it is discriminatory against a special class of taxpayer; and

V. Whether there is reasonable cause for the waiver of both penalties and interest.

Appellee noted a cross-appeal and raises one issue:

I. Whether the Tax Court has discretionary authority to reduce or abate interest on the assessments against appellants when the interest is assessed by statute and no statute gives the Tax Court authority to reduce or modify the interest.

For the reasons stated below, we hold that the Special Nonresident Tax does not violate the United States Constitution, Article 24 of the Declaration of Rights, or the Maryland Constitution. We also hold that the Tax Court has authority to consider the abatement of interest.

## FACTS AND LEGAL PROCEEDINGS

In 2004, appellants, three married couples, resided in the Commonwealth of Pennsylvania and paid Pennsylvania income taxes and various local taxes to its subdivisions. They did not own property in the State of Maryland and had no children enrolled in Maryland schools, but each couple filed a joint nonresident income tax return in Maryland because the husband was a partner in Saul Ewing, LLP ("the law firm" or "the partnership"), a multi-state law firm with offices in Maryland, Pennsylvania, Delaware, Washington, D.C., New York, and New Jersey.

During the 2004 calendar year, Mr. Antzis conducted his legal practice at his office in Chesterbrook, Pennsylvania; Mr. Frey's office was located in Wilmington, Delaware; and Mr.

Garcia's office was in Philadelphia, Pennsylvania. Messrs. Antzis, Frey, and Garcia each paid Maryland State income taxes with respect to their allocable share of the profit from the law firm. The law firm apportions its income among the states in which it does business, which, under Md.Code (2004), § 10–210 of the Tax–General Article ("T.G."), creates Maryland taxable income for appellants. There is also a withholding obligation for the law firm under T.G. § 10–102.1. These taxes are not in dispute.

In 2004, the General Assembly enacted a Special Nonresident Tax ("SNRT"), which applied to all taxable years beginning after December 31, 2003. 2004 Md. Laws 1915, 1928. The SNRT was imposed on an individual subject to Maryland State income tax, but not subject to the county or local income tax.[1] T.G. § 10–106.1(a). The tax rate of the SNRT "shall be equal to the lowest county income tax rate set by any Maryland county[.]" T.G. § 10–106.1(b). Appellants did not pay the amount required by T.G. § 10–106.1 and thus were assessed by appellee.[2] Appellants requested an informal hearing, which was held before a hearing officer on September 19, 2005.

On September 26, 2005, appellee issued Notices of Final Determination to each of the appellants. In the Notices, the hearing officer summarized appellants' positions:

> Mr. Harry Shapiro, Esq. appeared on behalf of the Taxpayers [appellants]. He argued that the assessment against the Taxpayers is improper because the special nonresident tax violates the Interstate Commerce Clause and Due Process Clause of the United States Constitution, as well as the Maryland Constitution. The basis for this claim is that the special nonresident tax places a tax burden on nonresidents that is not imposed on residents. Mr. Shapiro stated that

---

**1.** Throughout this opinion, the terms *county tax* and *local income tax* are used interchangeably.

**2.** The Notices of Income Tax Assessment were issued to the Garcias, Freys, and Antzises on July 6, July 22, and September 26, 2005, respectively.

the special nonresident tax is distinguishable from the local tax imposed on Maryland residents because the tax revenue from the special nonresident tax goes to the State of Maryland, while the tax revenue from the resident local tax goes to the Maryland counties.

The hearing officer then concluded:

Mr. Shapiro's constitutional challenges to the special nonresident tax exceed the scope of this hearing. Based upon the information provided, I find that the assessment was issued in accordance with Tax–General Article § 10–106.1. Therefore, the assessment is affirmed in the amounts stated above, which include additional interest accrued to date.

The assessments, as affirmed by the hearing officer, for each couple were:

| Appellant | Tax | Interest to Date | Penalty | Total |
|-----------|-----|------------------|---------|-------|
| Antzises | $579.96 | $37.77 | $58.00 | $675.73 |
| Freys | $308.33 | $20.08 | $30.83 | $359.24 |
| Garcias | $1,607.73 | $104.72 | $160.77 | $1,873.22 |

On October 24, 2005, appellants each filed a Petition of Appeal to the Maryland Tax Court. On February 15, 2006, by Order of the Tax Court, the cases were consolidated.

On May 10, 2006, a hearing was held before the Tax Court. No testimony was presented as the parties entered into a stipulation, but the court heard oral argument. By Order dated June 22, 2006, the Tax Court affirmed the assessments levied by appellee, but abated the penalty assessments. In its written opinion, the Tax Court commented that appellants had argued that T.G. § 10–106.1 "expressly discriminates against nonresidents by levying a tax on nonresident income which has no direct corollary with respect to residents." The Tax Court agreed that, "[a]t first blush, § 10–106.1. does indeed appear to discriminate against the out-of-state taxpayer, arguably interfering with the free flow of commerce mandated by the Commerce Clause, as well as violating the privileges and immunities guaranteed by the Privileges and Immunities Clause of the United States Constitution." The Tax Court further noted that "[t]his appearance of discrimination on the

surface ... does not end the inquiry" because under *Fulton Corp. v. Faulkner,* 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), the government may "overcome the presumption of invalidity 'by showing that the statute is a "compensatory tax" designed simply to make interstate commerce bear a burden already borne by intrastate commerce.' *Id.* at 331, 116 S.Ct. 848 (citations omitted)."

The Tax Court went on to apply the three-pronged test in *Fulton.* Under the first prong, which requires the State to identify the intrastate tax burden for which the State is attempting to compensate, *Fulton,* 516 U.S. at 332, 116 S.Ct. 848, the Tax Court commented that local governmental benefits, such as "police and fire protection, waste disposal, water and sewer services, and the myriad of other local governmental activities on behalf of people within each local jurisdiction, ... accrue both directly and indirectly to nonresidents while they are present or doing business in a jurisdiction." The Tax Court continued:

> Obviously, both residents and nonresidents receive these local governmental benefits by mere virtue of their physical presence within a jurisdiction, either in person or as part of a business entity doing business within the jurisdiction. It seems perfectly reasonable, therefore, for the State to seek compensation for these services from non-residents through the tax system. Although there is no direct mechanism to allocate the special non-resident tax revenue to a particular county, the General Fund of Maryland exists to provide funding for the benefit of all Maryland Counties and Baltimore City, selectively, through legislation and through the legislative budgeting process. In this regard, the evidence is clear that the burden on intrastate commerce for which § 10–106.1., is compensating, is the burden of providing local governmental services, directly or indirectly, to all persons or entities situate or doing business within its local borders.

When considering the second prong under *Fulton,* the Tax Court concluded that the SNRT "roughly approximates, but does not exceed the amount of the tax burden imposed on

residents." *See Fulton,* 516 U.S. at 332, 116 S.Ct. 848 ("Second, 'the tax on interstate commerce must be shown roughly to approximate—but not exceed—the amount of the tax on intrastate commerce.'") The Tax Court stated: "It is clear from the language of the statute, coupled with the existence of county income taxes paid by residents, that non-residents pay no more, and in most cases less, than their resident counterparts." The Tax Court commented that although *Comptroller of the Treasury v. Blanton,* 390 Md. 528, 890 A.2d 279 (2006), made "clear that the County income taxes are not just an element of the State income tax, but are rather separate and distinct taxes[,]" that "distinction does little to answer the question of whether § 10–106.1., as applied, is unconstitutional." The Tax Court found that "the distinction between the state and county income taxes to be irrelevant to the constitutional issue." The Tax Court added: "The facts reveal that the non-resident taxpayers are paying the same rate overall as the resident taxpayers, based on their Maryland income. Viewing this from a federal perspective, the burden on each class of taxpayer is the same overall." The Tax Court stated: "§ 10–106.1. ensures that non-residents pay Maryland income taxes at the same rate or a lesser rate as Maryland residents, albeit the revenue derived from this taxation is distributed differently once collected." Thus, the Tax Court concluded that the fact that the tax collected is distributed differently did not affect the constitutionality of the SNRT.

The third prong of the test requires that the "the events on which the interstate and intrastate taxes are imposed must be 'substantially equivalent'; that is, they must be sufficiently similar in substance to serve as mutually exclusive 'prox[ies]' for each other." *Fulton,* 516 U.S. at 333, 116 S.Ct. 848 (citations omitted). The Tax Court concluded:

> With respect to § 10–106.1., income is the event on which the tax is based for both residents and non-residents. Being the same event for both classes of taxpayer, it meets the test for 'substantially equivalent.' Hence, the third prong of

the three-part test under *Fulton* is also satisfied, and this Court finds that § 10–106.1. is a valid compensatory tax."

The Tax Court continued:

[T]his Court finds that § 10–106.1. serves a rational purpose to create parity in the income tax burdens between Maryland residents and non-residents. There is no extra tax burden that would deter a non-resident from free and open commerce inside or outside the state, and there is no extra tax burden that might be construed to violate the privileges and immunities, and equal protection accorded to everyone. Accordingly, § 10–106.1. does not violate the Interstate Commerce Clause of the United States Constitution, the Equal Protection Clause of the United States Constitution, the Privileges and Immunities Clause of the United States Constitution, or the Maryland Constitution and the Declaration of Rights.

The Tax Court also abated the penalties, but concluded that it did not have the authority to abate interest.

Appellants petitioned for judicial review in the Circuit Court for Anne Arundel County, where the cases were again consolidated. A hearing was held on July 2, 2007, and, by Order dated July 18, 2007, the circuit court affirmed the Tax Court's Order upholding the assessment of the SNRT, but remanded the case to the Tax Court "for consideration of abatement of interest." In its Memorandum Opinion, the circuit court stated that the local or county income tax was, in fact, a State tax:

It is clear from the statute, the legislative history and the applicable case authorities that the special nonresident tax is intended to make up for the fact that nonresidents do not pay the county tax. However, the so-called county tax is, in fact, a component of the State tax and not a separate tax altogether.

The circuit court recognized that the county portion of the income tax was distributed to the counties while the SNRT was distributed to the General Fund of the State, but conclud-

ed that "the ultimate use of the funds is not dispositive of the question." The circuit court stated:

As the local/county tax is a component of the Maryland State income tax and the total rate payable by nonresidents does not exceed that paid by residents, it follows that the nonresident tax does not place any increased burden upon nonresidents. Therefore, this tax is not discriminatory and does not violate any of the constitutional provisions relied upon by Petitioners.

Regarding the abatement of interest, the circuit court found:

Section 13–606 [of the Tax–General Article], entitled Waiver of Interest, provides that "[f]or reasonable cause, a tax collector may waive interest on unpaid tax." This Section parallels [Section] 13–714 and clearly authorizes the abatement of interest in the appropriate circumstances. The Tax Court erroneously concluded that it did not have authority to waive interest, and declined to exercise its discretion in this regard.

While the Circuit Court has the power to determine *de novo* a question of law, this court may not rule on a discretionary matter in the first instance. Accordingly, the case will be remanded to the Tax Court for consideration of waiver of interest under Section 13–606. If this Court had the authority to make the decision regarding abatement of interest, the Court would be inclined to waive interest on the unpaid tax. This Court finds that the issues raised by Petitioners are substantial, and that they pursued this matter in good faith and with reasonable cause.

Appellants then noted an appeal to this Court.

## DISCUSSION

Appellants claim that the SNRT is an additional Maryland State income tax imposed exclusively on nonresident taxpayers; therefore, it violates the commerce clause. According to appellants, as a result of the SNRT, in 2004, nonresidents were subject to Maryland State income tax at a rate of 6%,

that is, the 4.75% rate for the State income tax plus the 1.25% for the SNRT. In contrast, they claim that Maryland residents had to pay only Maryland State income tax at a rate of 4.75%. Appellants assert that they "were subjected to Maryland State income tax at a rate more than 25% higher than the rate imposed on residents." Appellants thus claim "that the SNRT is unconstitutional because (1) on its face, the SNRT discriminates against non-resident taxpayers and is thus *prima facie* unconstitutional and (2) the SNRT is not a valid 'compensatory tax' under the three part test set forth by the Supreme Court in" *Fulton Corp. v. Faulkner,* 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996). Appellants allege that the Tax Court incorrectly determined that the SNRT was a valid compensatory tax. They also claim that the circuit court failed to mention *Fulton* in its opinion and that it thus appears that the circuit court opinion is "predicated on the position that the SNRT does not discriminate against nonresidents because the local income taxes imposed by Maryland counties and the City of Baltimore are merely a component of Maryland State income taxes, and thus non-residents are not subjected to higher Maryland State income taxes than residents." Appellants claim that this conclusion is directly contrary to the previous position of appellee and the Court of Appeals' recent decision in *Comptroller of the Treasury v. Blanton,* 390 Md. 528, 890 A.2d 279 (2006).

Appellee responds that the SNRT does not treat nonresidents less favorably than residents because the tax is structured so that nonresidents will always pay the same or less tax on the same amount of income as residents pay. Appellee asserts that the SNRT is not disfavored treatment of nonresidents, but is a special method of state tax computation necessary to create equal treatment. Appellee refers us to U.S. Supreme Court cases and cases from our sister states to claim that it is not unconstitutional discrimination if the State uses different or distinctive methods to calculate the tax on nonresidents, so long as the burden on equivalent incomes—that of the resident and the in-state income of the nonresident—are the same. Appellee asserts that the courts have rejected the

formalistic distinctions that appellants attempt to draw and, instead, focus on the actual tax obligations.

Appellee further claims that the SNRT is a State tax and that the county tax imposed on residents is a State tax for constitutional purposes. It alleges that *Comptroller of the Treasury v. Blanton,* 390 Md. 528, 890 A.2d 279 (2006), did not alter that conclusion. Appellee thus asserts that the SNRT is not discriminatory.

## Standard of Review

"Despite its name, the Tax Court is not a court; instead, it is an adjudicatory administrative agency in the executive branch of state government." *Furnitureland South, Inc. v. Comptroller of the Treasury,* 364 Md. 126, 138 n. 8, 771 A.2d 1061 (2001) (citations omitted); *see also State Dep't of Assessments and Taxation v. Consolidation Coal Sales Co.,* 382 Md. 439, 453, 855 A.2d 1197 (2004) ("Because the Maryland Tax Court is an administrative agency, '[t]he standard of review for Tax Court decisions is generally the same as that for other administrative agencies.'") (Quoting *Supervisor of Assessments v. Hartge Yacht Yard, Inc.,* 379 Md. 452, 461, 842 A.2d 732 (2004)). Our inquiry "is not whether the circuit court erred, but rather whether the administrative agency erred." *Comptroller of the Treasury v. Clise Coal, Inc.,* 173 Md.App. 689, 697, 920 A.2d 561 (2007) (citation omitted). We thus undertake our own *de novo* review of the decision of the Tax Court. *Maryland Bd. of Physicians v. Elliott,* 170 Md.App. 369, 400, 907 A.2d 321, *cert. denied,* 396 Md. 12, 912 A.2d 648 (2006) (quoting *Pollard's Towing, Inc. v. Berman's Body Frame & Mech., Inc.,* 137 Md.App. 277, 287, 768 A.2d 131 (2001)).

Our review is narrow, *Finucan v. Maryland State Bd. of Physician Quality Assurance,* 151 Md.App. 399, 411, 827 A.2d 176 (2003), *aff'd,* 380 Md. 577, 846 A.2d 377 (2004), and is " 'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclu-

sions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.'" *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67–68, 729 A.2d 376 (1999) (quoting *United Parcel Serv. v. People's Counsel for Baltimore County*, 336 Md. 569, 577, 650 A.2d 226 (1994)). It is not our job to substitute our judgment for that of the Tax Court. *See Maryland–National Capital Park and Planning Comm'n v. Anderson*, 395 Md. 172, 180–81, 909 A.2d 694 (2006) (The reviewing court " 'must not itself make independent findings of fact or substitute its judgment for that of the agency' ") (quoting *Baltimore Lutheran High School Ass'n v. Employment Security Admin.*, 302 Md. 649, 662, 490 A.2d 701 (1985)); *United Parcel*, 336 Md. at 576–77, 650 A.2d 226 ("The court's task on review is *not* to ' "substitute its judgment for the expertise of those persons who constitute the administrative agency." ' ") (Quoting *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512, 390 A.2d 1119 (1978)) (quoting *Bernstein v. Real Estate Comm'n*, 221 Md. 221, 230, 156 A.2d 657 (1959), *appeal dismissed*, 363 U.S. 419, 80 S.Ct. 1257, 4 L.Ed.2d 1515 (1960)) (emphasis in *United Parcel* ).

We are not bound by the Tax Court's interpretation of the law. *Gigeous v. Eastern Corr. Inst.*, 363 Md. 481, 496, 769 A.2d 912 (2001). We review the Tax Court's conclusions of law *de novo* for correctness. *Schwartz v. Maryland Dep't of Natural Res.*, 385 Md. 534, 554, 870 A.2d 168 (2005). "Determining whether an agency's 'conclusions of law' are correct is always, on judicial review, the court's prerogative, although we ordinarily respect the agency's expertise and give weight to its interpretation of a statute that it administers." *Christopher v. Montgomery County Dep't of Health and Human Services*, 381 Md. 188, 198, 849 A.2d 46 (2004) (citations omitted); *see also Maryland Aviation Admin. v. Noland*, 386 Md. 556, 573, 873 A.2d 1145 (2005) (" 'Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the

statute which the agency administers should ordinarily be given considerable weight by reviewing courts.' ") (Quoting *Banks,* 354 Md. at 67–69, 729 A.2d 376).[3]

■ Moreover, "[a]n administrative agency may be affirmed only on the basis of the grounds on which it decided the case." *Dep't of Health and Mental Hygiene v. Campbell,* 364 Md. 108, 111 n. 1, 771 A.2d 1051 (2001) (citations omitted); *see also Evans v. Burruss,* 401 Md. 586, 593, 933 A.2d 872 (2007) (" 'in judicial review of agency action the court may not uphold the agency order unless it is sustainable on the agency's findings and for the reasons stated by the agency' ") (quoting *United Steelworkers of America AFL–CIO, Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 679, 472 A.2d 62 (1984)), *cert. denied,* —— U.S. ——, 128 S.Ct. 1309, 170 L.Ed.2d 73 (2008); *County Council of Prince George's County sitting as District Council v. Brandywine Enters.,* 350 Md. 339, 349, 711 A.2d 1346 (1998) ("we will review an adjudicatory agency decision solely on the grounds relied upon by the agency") (citations omitted).

■ Finally, "recognizing that the agency's decision is 'prima facie correct and presumed valid,' 'we must review the agency's decision in the light most favorable to it.' " *Comptroller of the Treasury v. Citicorp Int'l Commc'ns, Inc.,* 389 Md. 156, 163, 884 A.2d 112 (2005) (quoting *Ramsay, Scarlett & Co. v. Comptroller of the Treasury,* 302 Md. 825, 835, 490 A.2d 1296 (1985)); *see also* T.G. § 13–411 ("[a]n assessment of tax . . . is prima facie correct").

---

**3.** Appellee claims that because the facts were stipulated in the Tax Court, only questions of law are before this Court. *See General Electric Co. v. Commissioner, New Hampshire Dep't of Revenue Admin.,* 154 N.H. 457, 914 A.2d 246, 252 (2006) ("The facts are not disputed by the parties and the question of whether [the tax statute] violates the Commerce Clause of the Federal Constitution is a question of law that we review *de novo."),* *cert. denied,* —— U.S. ——, 128 S.Ct. 529, 169 L.Ed.2d 337 (2007). *But see Annenberg v. Pennsylvania,* 562 Pa. 581, 757 A.2d 338, 342 (2000) ("the inquiry into whether the stock clause is a compensatory tax is largely factual in nature").

## The Commerce Clause

■■■■ The Commerce Clause of the United States Constitution provides: "The Congress shall have Power ... [t]o regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. "The very purpose of the Commerce Clause was to create an area of free trade among the several States." *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 330, 64 S.Ct. 1023, 88 L.Ed. 1304 (1944); *see also Armco Inc. v. Hardesty*, 467 U.S. 638, 642, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984) ("It long has been established that the Commerce Clause of its own force protects free trade among the States.") (Citations omitted). "Though phrased as a grant of regulatory power to Congress, the Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Environmental Quality of the State of Oregon*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) (citations omitted); *see also Assoc. Indus. of Missouri v. Lohman*, 511 U.S. 641, 646, 114 S.Ct. 1815, 128 L.Ed.2d 639 (1994) ("[I]t is well established that the [Commerce] Clause also embodies a negative command forbidding the States to discriminate against interstate trade.") (Citations omitted). This negative command, also known as the dormant Commerce Clause, "prohibit[s] certain state taxation even when Congress has failed to legislate on the subject." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995).

■■■■ "The modern law of what has come to be called the dormant Commerce Clause is driven by concern about 'economic protectionism-that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dep't of Revenue of Kentucky v. Davis*, ⸺ U.S. ⸺, 128 S.Ct. 1801, 1808, 170 L.Ed.2d 685 (2008) (quoting *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 273, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)). Thus, "[n]o State, consistent with the Commerce Clause, may 'impose a

tax which discriminates against interstate commerce ... by providing a direct commercial advantage to local business[.]'" *Boston Stock Exchange v. State Tax Comm'n,* 429 U.S. 318, 329, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977) (quoting *Nw. States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 458, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959)); *see also Armco Inc.,* 467 U.S. at 642, 104 S.Ct. 2620 ("[A] State 'may not discriminate between transactions on the basis of some interstate element.' That is, a State may not tax a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State.") (Quoting *Boston Stock Exchange,* 429 U.S. at 332 n. 12, 97 S.Ct. 599).

 Here, we must pause briefly to consider whether the SNRT falls under the Commerce Clause. The parties proceed under the assumption that the Commerce Clause applies even though no goods or articles of trade cross state lines.

In *Colgate v. Harvey,* 296 U.S. 404, 56 S.Ct. 252, 80 L.Ed. 299 (1935), *overruled on other grounds, Madden v. Kentucky,* 309 U.S. 83, 93, 60 S.Ct. 406, 84 L.Ed. 590 (1940), the challenged Vermont statute imposed a tax on dividends earned outside of Vermont, while exempting dividends earned within the state. The statute also taxed interest earned on out-of-state loans, but not interest earned on in-state loans. The Supreme Court concluded that the Commerce Clause was not implicated. *Id.* at 419 n. 2, 56 S.Ct. 252. The Supreme Court wrote that "clearly a tax upon income is not an interference with interstate commerce simply because the income is derived from a source within another state; and, moreover, if there be any tendency to interfere with such commerce, it is purely collateral and incidental." *Id.* (citations omitted); *see also Shaffer v. Carter,* 252 U.S. 37, 57, 40 S.Ct. 221, 64 L.Ed. 445 (1920) (Supreme Court assumed that Oklahoma income tax imposed on income from property owned by nonresident fell under the Commerce Clause because it "fairly appear[ed]" that nonresident's method of business, which entailed shipping the products of his oil business out of state, constituted interstate commerce; Oklahoma income tax did not offend the

Commerce Clause). Nonetheless, in *Dominion Nat'l Bank v. Olsen,* 771 F.2d 108, 111 (6th Cir.1985), the Court of Appeals for the Sixth Circuit concluded that the Supreme Court decisions since *Harvey,* specifically *Boston Stock Exchange v. State Tax Comm'n,* 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977), demonstrated that the Commerce Clause did apply to a Tennessee statute levying a tax on earnings from certificates of deposits issued by out-of-state financial institutions, but owned by in-state residents. *See also Fulton Corp. v. Faulkner,* 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996) (North Carolina's "intangibles tax" on corporate stock owned by residents allowed for a percentage deduction equal to the fraction of the issuing corporation's income subject to North Carolina tax; therefore, intangibles tax facially discriminated against interstate commerce).

In the present case, since the law firm is doing business in Maryland and appellants, Pennsylvania residents, are partners in the law firm and thus earn income in Maryland, which is taxed under the SNRT, the Commerce Clause applies. *Contra Carlson v. State of Alaska, Commercial Fisheries Entry Comm'n,* 919 P.2d 1337, 1340 (Alaska 1996) (Alaska's practice of charging nonresident commercial fishers licensing and limited entry fees three times greater than fees charged to resident commercial fishers was not analyzed under the Commerce Clause because the "fee differentials at issue ... are not predicated upon the movement of articles of commerce across state lines, but rather upon the residency status of those applying for permits"; fee differentials were thus analyzed under the Privileges and Immunities and Equal Protection Clauses); *Kuhnen v. Musolf,* 143 Wis.2d 134, 420 N.W.2d 401, 413 (Ct.App.1988) (statutes prohibiting taxpayer from deducting moving expenses from state income tax that were deductible for federal income tax purposes and requiring proration of taxpayer's personal exemptions and property tax credit for months during which taxpayer did not live in state did not violate the Commerce Clause; the Court noted that, "[c]ontrary to the usual case, the claim is not that Wisconsin seeks, by its tax laws, to create a favorable climate for local

industry at the expense of other state's, but that Wisconsin's tax laws create an unfavorable climate for its own industries and labor force"; the Court did "not believe that the commerce clause was intended to extend its protection to individuals who claim a disadvantage from such state tax laws"; the statutes affected interstate commerce only incidently and remotely so that taxes levied were not a burden on interstate commerce).

"[T]he first step in analyzing any law subject to judicial scrutiny under the negative Commerce Clause is to determine whether it 'regulates evenhandedly with only "incidental" effects on interstate commerce, or discriminates against interstate commerce.'" *Oregon Waste*, 511 U.S. at 99, 114 S.Ct. 1345 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)). Discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste*, 511 U.S. at 99, 114 S.Ct. 1345; *see also Gregg Dyeing Co. v. Query*, 286 U.S. 472, 481, 52 S.Ct. 631, 76 L.Ed. 1232 (1932) ("Discrimination, like interstate commerce itself, is a practical conception. We must deal in this matter, as in others, with substantial distinctions and real injuries.") (Citation omitted). "If a restriction on commerce is discriminatory, it is virtually *per se* invalid." *Id.* (citations omitted); *see also Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) ("When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry.") Further, "justifications for discriminatory restrictions on commerce [must] pass the 'strictest scrutiny.'" *Oregon Waste*, 511 U.S. at 101, 114 S.Ct. 1345 (quoting *Hughes*, 441 U.S. at 337, 99 S.Ct. 1727). Indeed, "[t]he State's burden of justification is so heavy that 'facial discrimination by itself maybe a fatal defect.'" *Id.* (quoting *Hughes*, 441 U.S. at 337, 99 S.Ct. 1727).

██ "By contrast, nondiscriminatory regulations that have only incidental effects on interstate commerce are valid unless 'the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.' " *Oregon Waste,* 511 U.S. at 99, 114 S.Ct. 1345 (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)). Under the *Pike* balancing test,

> [w]here the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, but more frequently it has spoken in terms of 'direct' and 'indirect' effects and burdens.

*Pike,* 397 U.S. at 142, 90 S.Ct. 844 (1970) (citations omitted).[4]

The Supreme Court has recognized that "there is no clear line separating the category of state regulation that is virtually *per se* invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach." *Brown–Forman Distillers,* 476 U.S. at 579, 106 S.Ct. 2080; *see also General Motors Corp. v. Tracy,* 519 U.S. 278, 298, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (noting that "there is no clear line" between the two strands of analysis and citing to "several cases that have purported to apply the undue burden test (including *Pike* itself) [, but that] arguably turned in whole or in part on the discriminatory character of the challenged state regulations") (citations omitted). The Supreme Court has also recognized that some of this problem results

---

4. We note that appellee, who asserts that the SNRT is not discriminatory, does not refer us to the *Pike* balancing test. Appellants allege that the SNRT is facially discriminatory and thus do not rely on *Pike.*

from the case-by-case analysis required by the Commerce Clause:

> On various occasions when called upon to make the delicate adjustment between the national interest in free and open trade and the legitimate interest of the individual States in exercising their taxing powers, the Court has counseled that the result turns on the unique characteristics of the statute at issue and the particular circumstances in each case.

*Boston Stock Exchange*, 429 U.S. at 329, 97 S.Ct. 599 (citations omitted); *see also Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388, 403, 104 S.Ct. 1856, 80 L.Ed.2d 388 (1984) (case-by-case analysis under the Commerce Clause has left " ' "much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation" ' ") (quoting *Boston Stock Exchange*, 429 U.S. at 329, 97 S.Ct. 599) (quoting *Nw. States Portland Cement*, 358 U.S. at 457, 79 S.Ct. 357); *Freeman v. Hewit*, 329 U.S. 249, 252, 67 S.Ct. 274, 91 L.Ed. 265 (1946) ("The history of this problem [the dormant Commerce Clause] is spread over hundreds of volumes of our Reports. To attempt to harmonize all that has been said in the past would neither clarify what has gone before nor guide the future. Suffice it to say that especially in this field opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts."), *overruled on other grounds, Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 288–89, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977); *Tyler Pipe Indus. v. Washington State Dep't of Revenue*, 483 U.S. 232, 260, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987) ("The fact is that in the 114 years since the doctrine of the negative Commerce Clause was formally adopted as holding of this Court, and in the 50 years prior to that in which it was alluded to in various dicta of the Court, our applications of the doctrine have, not to put too fine a point on the matter, made no sense.") (Scalia, J., concurring in part and dissenting in part). Nonetheless, under either test, "the critical consideration is the overall effect of the

statute on both local and interstate activity." *Brown–Forman Distillers,* 476 U.S. at 579, 106 S.Ct. 2080 (citation omitted).

 Further, "a facially discriminatory tax may still survive Commerce Clause scrutiny if it is a truly ' "compensatory tax" designed simply to make interstate commerce bear a burden already borne by intrastate commerce.' " *Fulton,* 516 U.S. at 331, 116 S.Ct. 848 (quoting *Assoc. Indus. of Missouri,* 511 U.S. at 647, 114 S.Ct. 1815) (footnote omitted). In *Oregon Waste,* the Supreme Court explained the principles of the compensatory tax doctrine:

> To justify a charge on interstate commerce as a compensatory tax, a State must, as a threshold matter, "identif[y] ... the [intrastate tax] burden for which the State is attempting to compensate." [*Maryland v. Louisiana,* 451 U.S. 725, 758, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) ]. Once that burden has been identified, the tax on interstate commerce must be shown roughly to approximate-but not exceed-the amount of the tax on intrastate commerce. *See, e.g., Alaska v. Arctic Maid,* 366 U.S. 199, 204–05[, 81 S.Ct. 929, 6 L.Ed.2d 227] (1961). Finally, the events on which the interstate and intrastate taxes are imposed must be "substantially equivalent"; that is, they must be sufficiently similar in substance to serve as mutually exclusive "prox[ies]" for each other. *Armco, supra,* 467 U.S., at 643[, 104 S.Ct. 2620]. As Justice Cardozo explained for the Court in *[Henneford v. Silas Mason Co.,* 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937) ], under a truly compensatory tax scheme "the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed." 300 U.S., at 584, 57 S.Ct. 524.

*Oregon Waste,* 511 U.S. at 103, 114 S.Ct. 1345 (footnote omitted and some citations omitted); *see also Maryland v. Louisiana,* 451 U.S. 725, 759, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981) ("The common thread running through the cases upholding compensatory taxes is the equality of treatment be-

tween local and interstate commerce.") (Citations omitted). "As with any other defense of a facially discriminatory tax, the State has the burden to show that the requirements of the compensatory tax doctrine are clearly met." *Fulton*, 516 U.S. at 344, 116 S.Ct. 848 (citation omitted). Indeed, the Supreme Court stated that it "doubt[ed] that such a showing can ever be made outside the limited confines of sales and use taxes . . . ." *Id.*

Appellants contend that because the SNRT is imposed on nonresidents only and results in nonresidents paying a higher Maryland State income tax than residents, the SNRT facially discriminates against interstate commerce. They assert that this facial discrimination is not cured or offset by the fact that residents are subject to the county income tax in addition to the Maryland State income tax. They claim this is so because the county income taxes are imposed by each separate county and not by the State. Appellants contend that in *Comptroller of the Treasury v. Blanton*, 390 Md. 528, 533–34, 890 A.2d 279 (2006), the Court of Appeals held that county income taxes are separate and distinct from the State income tax and rejected a claim that county income taxes should be considered as part of the State income tax.

Appellants also note that all county income taxes are remitted to the counties that impose them and are used exclusively to provide governmental services to residents of those counties. In contrast, the SNRT is distributed to the General Fund of the State and not to a political subdivision of the State. Further, the county tax is imposed on each resident and does not relate to where the individual is employed or conducts his or her business.

· Appellee responds that when the SNRT is considered in conjunction with the county income tax, which appellee asserts is also a State tax, there is no discriminatory effect.

The Tax Court looked solely at the SNRT and did not consider its place in the income tax scheme of the Tax–General Article. The Tax Court thus concluded that the SNRT was discriminatory on its face:

Petitioners [appellants] cite the United States Supreme Court's recent ruling in *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), which found that ... the state laws discriminating against interstate commerce on their face are "virtually per se invalid." They contend that Tax–General Art. § 10–106.1. is just such a statute in that it expressly discriminates against nonresidents by levying a tax on nonresident income which has no direct corollary with respect to residents. At first blush, § 10–106.1. does indeed appear to discriminate against the out-of-state taxpayer, arguably interfering with the free flow of commerce mandated by the Commerce Clause, as well as violating the privileges and immunities guaranteed by the Privileges and Immunities Clause of the United States Constitution. Taken on its face, this would make the statute unconstitutional as to the United States Constitution, as well as the Maryland Constitution and Declaration of Rights.

We conclude that the SNRT may be viewed by itself or part of the tax scheme because the U.S. Supreme Court cases demonstrate that, at times, the Court has looked at the tax scheme and, at other times, it has limited its view to the specific tax in question.

In *Maryland v. Louisiana*, 451 U.S. at 756, 101 S.Ct. 2114 (citations omitted), the Supreme Court explained:

> A state tax must be assessed in light of its actual effect considered in conjunction with other provisions of the State's tax scheme. "In each case it is our duty to determine whether the statute under attack, whatever its name may be, will in its practical operation work discrimination against interstate commerce." *Best & Co. v. Maxwell*, 311 U.S. 454, 455–56, 61 S.Ct. 334, 85 L.Ed. 275 (1940).

*See also General Motors Corp. v. Tracy*, 519 U.S. 278, 304, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (examining "Ohio's tax scheme[,]" which imposed taxes on natural gas purchases made from sellers who are not considered "local distribution companies" as defined under Ohio regulations); *Fulton*, 516

U.S. at 333, 116 S.Ct. 848 (considering the tax "regime" in determining that the "intangibles tax" was facially discriminatory); *Assoc. Indus. of Missouri*, 511 U.S. at 654, 114 S.Ct. 1815 ("we repeatedly have focused our Commerce Clause analysis on whether a challenged [tax] scheme is discriminatory in 'effect' ") (citations omitted); *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 69, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963) ("a proper analysis must take 'the whole scheme of taxation into account' ") (quoting *Galveston, H. & S.A.R. Co. v. Texas*, 210 U.S. 217, 227, 28 S.Ct. 638, 52 L.Ed. 1031 (1908)); *Henneford v. Silas Mason Co.*, 300 U.S. 577, 579–82, 57 S.Ct. 524, 81 L.Ed. 814 (1937) (Supreme Court examined the tax "system" to determine that it did not violate the Commerce Clause). At other times, the Court has compared the taxes imposed on an activity or product that is conducted, made, or sold both in-state and out-of-state, but which taxes the out-of-state activity or product at a higher rate. *See Oregon Waste*, 511 U.S. at 99, 114 S.Ct. 1345 (surcharge on out-of-state waste that was three times higher than charge imposed on in-state waste was facially discriminatory); *Chemical Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 342, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992) (Alabama's surcharge on hazardous waste from other States was facially discriminatory because it imposed a higher fee on the disposal of out-of-state waste than on the disposal of identical in-state waste); *Armco Inc. v. Hardesty*, 467 U.S. 638, 642, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984) (gross receipts tax imposed on whole sale of tangible property manufactured out of state, but not imposed on tangible property manufactured in-state was discriminatory). In *Boston Stock Exchange*, 429 U.S. at 331, 97 S.Ct. 599, however, the Supreme Court looked at a single New York statute, which, as amended, imposed a higher transfer tax on out-of-state sales and was thus discriminatory. We further note, that the Supreme Court also instructs that the reviewing court must determine whether the tax is discriminatory on its face. *See Fulton*, 516 U.S. at 331, 116 S.Ct. 848 ("State laws discriminating against interstate commerce on their face are 'virtually per se invalid.' ") (Citations omitted). This lends

itself to the conclusion that we need not look beyond the SNRT itself.

We conclude that the SNRT, when examined within the tax scheme of the Tax–General Article, is not discriminatory. We further determine that, within the case-by-case analysis permitted under the Commerce Clause, the Tax Court did not err in determining that the SNRT, on its face, was discriminatory, but that it was a valid compensatory tax. We believe that either approach passes constitutional muster. We explain.

## Maryland's Income Tax Scheme

 The SNRT imposes a tax on all individuals subject to the State income tax, "but not subject to the county income tax...." T.G. § 10–106.1(a).[5] The tax rate of the SNRT is "equal to the lowest county income tax rate set by any Maryland county[.]" T.G. § 10–106.1(b).

In general, a "resident," which, with some exceptions, is defined in T.G. § 10–101(k) as an individual domiciled in the State of Maryland, is subject to an income tax on the resident's "Maryland adjusted gross income." T.G. § 10–102. A resident's Maryland adjusted gross income is, with certain exceptions and adjustments, the individual's "federal adjusted gross income for the taxable year[.]" T.G. § 10–203. A resident's Maryland taxable income is the individual's "Maryland adjusted gross income, less the exemptions and deductions allowed" under the Tax–General Article. T.G. § 10–101(i)(1). At the time in question, in most instances, the State

---

5. Tax–General § 10–106.1 states:

 **§ 10–106.1. Persons not subject to county income tax**
 (a) An individual subject to the State income tax under § 10–105(a) of this subtitle, but not subject to the county income tax under § 10–106 of this subtitle, shall be subject to the tax imposed under this section.
 (b) The rate of the tax imposed under this section shall be equal to the lowest county income tax rate set by any Maryland county in accordance with § 10–106 of this subtitle.
 (c) The tax imposed under this section shall be distributed by the Comptroller in accordance with § 2–609 of this article.

income tax rate of 4.75% was imposed upon an individual's Maryland taxable income. T.G. § 10–105(a)(4)(v).[6]

Maryland residents also pay a "county income tax,"[7] which is provided for under T.G. § 10–103(a), and which states, in part:

(a) *Required.*—Each county shall have a county income tax on the Maryland taxable income of:

(1) each resident, other than a fiduciary, who on the last day of the taxable year:

(i) is domiciled in the county; or

(ii) maintains a principal residence or a place of abode in the county;

The rate of the county income tax is provided for in T.G. § 10–106, which states:

(a) *In general; exception in Howard County.*—(1) Each county shall set, by ordinance or resolution, a county income tax equal to at least 1% but not more than the percentage of an individual's Maryland taxable income as follows:

\* \* \*

(iii) 3.20% for a taxable year beginning after December 31, 2001.

(2) A county income tax rate continues until the county changes the rate by ordinance or resolution.

(3)(i) A county may not increase its county income tax rate above 2.6% until after the county has held a public hearing on the proposed act, ordinance, or resolution to increase the rate.

---

6. Tax–General § 10–105 has since been amended several times and, at present, provides for slightly lower and higher tax rates depending on an individual's Maryland taxable income.

7. " 'County' means a county of the State and, unless expressly provided otherwise, Baltimore City." T.G. § 1–101(f).

(ii) The county shall publish at least once each week for 2 successive weeks in a newspaper of general circulation in the county:

1. notice of the public hearing; and

2. a fair summary of the proposed act, ordinance, or resolution to increase the county income tax rate above 2.6%.

(4) Notwithstanding paragraph (1) or (2) of this subsection, in Howard County, the county income tax rate may be changed only by ordinance and not by resolution.

(b) If a county changes its county income tax rate, the county shall:

(1) increase or decrease the rate in increments of one one-hundredth of a percentage point, effective on January 1 of the year that the county designates; and

(2) give the Comptroller notice of the rate change and the effective date of the rate change on or before July 1 prior to its effective date.

In 2004, the lowest county tax rate was 1.25%.

Although the Tax–General Article provides for a county income tax, the counties may not impose their own income tax. Tax–General § 10–103(b) states:

> Except for the county income tax, a county, municipal corporation, special taxing district, or other political subdivision may not impose a general local income, earnings, or payroll tax, a general occupational license tax, or a general license or permit tax based on income, earnings, or gross receipts.

The Comptroller thus administers both the State and county income taxes, which are paid on a single tax return. *See* T.G. § 2–102(4) ("the Comptroller shall administer the laws that relate to ... the income tax"); T.G. § 2–104(a) ("the Comptroller shall design the returns and other forms that, on completion, provide the information required for the administration of the tax laws listed in § 2–102 of this subtitle"); T.G. § 2–109(a) (the Comptroller collects the taxes that the Comp-

troller administers, accounts for the revenue from those taxes, and distributes the revenue).

The Comptroller also controls the distribution of tax revenue to the counties. *See* T.G. § 2–608(a) (after certain other distributions are completed, "the Comptroller shall distribute to each county the remaining income tax revenue from individuals attributable to the county income tax for that county"); T.G. § 2–610(a) ("The Comptroller shall make the distributions of income tax revenue from individuals attributable to county income tax periodically to a county, municipal corporation, or special taxing district.")

The proceeds from the SNRT go to the General Fund of the State.[8] *See* T.G. § 10–106.1 ("The tax imposed under this section shall be distributed by the Comptroller in accordance with § 2–609 of this article."); T.G. § 2–609 ("After making the distributions required under §§ 2–604 through 2–608.1 [, which require distributions to the refund account, the administrative fund account, the unallocated individual revenue account, municipal corporations and special taxing districts, the counties, and the municipalities,] the Comptroller shall distribute the remaining income tax revenue from individuals to the General Fund of the State.")

Here, contrary to appellants' assertions, the SNRT is not disfavored treatment and is not discriminatory; rather, the SNRT is equivalent to the county income tax imposed upon residents. It is thus a State-imposed tax that nonresidents pay. In 1967, the concept of the local or county income tax was adopted for the first time. *Stern v. Comptroller of the Treasury*, 271 Md. 310, 312, 316 A.2d 240 (1974). In *Stern,*

---

**8.** *Black's Law Dictionary* 343, 348 (abridged 5th ed.1983) defines General Fund:

> *General fund.* This phrase, in many states, is a collective designation of all the assets of the state which furnish the means for the support of government and for defraying the discretionary appropriations of the legislature. Such are distinguished from assets of a special character, such as the school fund.
> * * *
> The primary operating fund of a governmental unit.

the question before the Court of Appeals was whether the Sterns were entitled to claim a credit for income taxes paid to New York State against that portion of their Maryland income tax that would be collected by the Comptroller and paid to Montgomery County where Petitioners resided. *Id.* at 310, 316 A.2d 240. For two years, the Sterns filed Maryland income tax returns and took as a credit against the State and local income tax the amount of income taxes paid to New York State. *Id.* at 312, 316 A.2d 240. The Comptroller assessed a deficiency along with penalty and interest. *Id.* at 313, 316 A.2d 240. In the Tax Court, the assessments were affirmed and the Sterns appealed.

At the time in question, Art. 81, § 290 allowed Maryland residents a credit for income taxes paid to another state and provided:

> Whenever a resident individual of this State has become liable for income tax to another state upon such part of his net income for the taxable year as is properly subject to taxation in such state, *the amount of income tax payable by him under this subtitle* shall be reduced by the amount of the income tax so paid by him to such other state upon his producing to the Comptroller satisfactory evidence of the fact of such payment; but application of such credit shall not operate to reduce the tax payable under this subtitle to an amount less than would have been payable if the income subjected to tax in such other state were ignored.... (Emphasis supplied.)

The provision allowing for the local income tax then appeared in Art. 81, § 283(a) and stated:

> The county council or board of county commissioners of any county and the mayor and city council of Baltimore, by ordinance or resolution enacted pursuant to their ordinary and regular legislative procedure, shall adopt, by reference, a local income tax imposed upon the residents of any county or Baltimore City as a percentage of the liability of such resident for State income tax. Any ordinance or resolution so enacted shall impose a rate of tax for any current

calendar year and may provide that such tax rate shall continue in effect for each succeeding calendar year, unless and until such tax rate is changed or modified by a subsequent ordinance or resolution. Any income tax so adopted shall not be less than twenty (20) percent nor more than fifty (50) percent of the State income tax liability of such resident, and any such tax imposed, and any increase or decrease in any tax so imposed, shall be in increments of five (5) percent.

In *Stern,* the Court of Appeals discussed the nature of the local income tax:

We think that the case turns simply on a question of statutory construction. When section 290 provides that *"the amount of income tax payable by him under this subtitle* shall be reduced by the amount of the income tax so paid by him to such other state" (emphasis supplied), reference is clearly being made to taxes imposed by sections 729 through 323A of article 81, subtitled "Income Tax." While the argument that the tax is actually imposed by the ordinance or resolution adopted by the political subdivision is liminally attractive, its appeal is considerably attenuated by the provision of section 283(c) that "Local income taxes imposed pursuant to this section shall be subject to the provisions of § 312 of this subtitle relating generally to withholding at the source, declaration of estimated tax due, and remittance thereof to the Comptroller." Further, section 283(a) has provided since 1969 that the counties and Baltimore City *"shall adopt"* (emphasis supplied) local income taxes. There is no discretion in the subdivisions to adopt or refuse to adopt such a tax; the imposition of the tax is mandatory, and it is only with respect to the establishment of the rate of tax that the local governments retain a modicum of flexibility. In other words, one mechanism, that prescribed by the subtitle, is used for the collection of the tax imposed by section 288(a) (individuals), section 288(b) (corporations), and that created by section 283.

*Stern,* 271 Md. at 313–14, 316 A.2d 240 (footnote omitted). The Court of Appeals reversed the Tax Court and allowed the

out-of-state taxes to reduce the Sterns' local income tax liability because the credit provided for in Art. 81, § 290 was allowed against State taxes. *Id.* at 313–15, 316 A.2d 240. The Court of Appeals thus concluded that the local income tax was a State tax because it was imposed by State law. *Id.*

More recently, in *Comptroller of the Treasury v. Blanton,* 390 Md. 528, 890 A.2d 279 (2006), the Court of Appeals was asked to determine whether a tax credit provided pursuant to T.G. § 10–703(a) could properly be applied to both State and local income taxes paid by an individual. *Id.* at 530–31, 890 A.2d 279. Tax General § 10–703(a) provides, in relevant part, that "a resident may claim a credit only against the State income tax." The Court of Appeals concluded that T.G. § 10–703(a) "does not reduce the amount owed by a Maryland resident for local income tax. The tax credit may be applied only to reduce the amount of an individual's state income tax liability." *Id.* at 531, 890 A.2d 279.

In 2001, the Blantons were residents of Baltimore County and held property interests in North Carolina. *Id.* They paid income taxes in both states. *Id.* The Court of Appeals noted that the Blantons were allowed a credit for the North Carolina income tax they paid, but that credit was nearly $6,000.00 less than the total amount of income tax they had paid to North Carolina. *Id.* at 532, 890 A.2d 279. In addition, this credit reduced the Maryland State income tax they owed, but did not affect the local income tax. *Id.* The total income tax owed by the Blantons was $ 10,875.60. *Id.* The amount owed after prior payments, taxes withheld, and all credits and offsets was $4,637.60. *Id.* On their 2001 Resident Maryland Tax Return, however, the Blantons subtracted the North Carolina income tax amount from the total of their Maryland state income tax and local income tax. *Id.* The Blantons thus calculated the amount of Maryland Tax owed to be $4,998.00. *Id.* The Blantons enclosed a letter with their tax return, asserting that the tax return form was flawed because it required that the State and local income taxes be calculated independently of each other. *Id.* Although the Blantons claimed that they paid the Comptroller a total of $4,998.00, the Comptroller sent

them a letter requiring them to pay the outstanding tax balance of $4,637.60. *Id.*

The Blantons requested an informal hearing, after which the Comptroller affirmed the assessment. *Id.* at 532–33, 890 A.2d 279. The Blantons appealed to the Tax Court, which "determined that the Legislature defined State tax and local tax as two distinct taxes, and, as such, they 'are not the same, they are two separate ideas.' " *Id.* at 533, 890 A.2d 279. The Tax Court further concluded that T.G. § 10–703(a) "directs a credit against the State income tax only." *Id.* at 533, 890 A.2d 279. The Tax Court affirmed the Comptroller's decision, holding that "the Legislature intended for the credit to apply against the State income tax and not the local income tax." *Id.* at 533, 890 A.2d 279.

The Blantons petitioned for judicial review in the Circuit Court for Baltimore County, which reversed the Tax Court. *Id.* Relying on *Stern,* the circuit court held that the definition of "State income tax" included the local income tax for purposes of the tax credit provided for in T.G. § 10–703(a). *Id.* at 533, 890 A.2d 279. The Comptroller appealed that decision to this Court, but before we could decide the appeal, the Court of Appeals, on its own initiative, issued a writ of certiorari. *Id.* at 531, 890 A.2d 279.

The Court of Appeals framed the issue before it: "[W]hether the language of § 10–703(a) of the Tax–General Article allows for a credit solely toward the State income tax, or allows for a credit toward both State and local income taxes." *Blanton,* 390 Md. at 535, 890 A.2d 279. The Court of Appeals held that T.G. § 10–703(a) referred "only to the State income tax." *Id.* at 535, 890 A.2d 279.

Tax General § 10–703(a) provides:

**§ 10–703 Tax paid to another state.**

(a) Except as provided in subsection (b) of this section, a resident may claim a credit only against the State income tax for a taxable year in the amount determined under subsection (c) of this section for State tax on income paid to another state for the year.

The Court of Appeals concluded that the statute was unambiguous. *Blanton*, 390 Md. at 537, 890 A.2d 279. The Court explained:

In the case *sub judice*, if the General Assembly had intended to include, in the availability of the tax credit, both State and local income tax, it could have clearly stated that intent. It did not. Instead, the Legislature used the words "only ... State income tax." In its expression of one narrow objective (a credit against only the State income tax), it canceled out all other possibilities. The word "only" is limited by what it expresses, the credit applies only toward the State portion of the income tax, not the local income tax. The plain meaning of the statute is that the local tax is excluded, and only State tax may be offset or reduced. We hold that § 10–703(a) of the Tax–General Article shows a clear legislative intent to limit the credit to State income tax to Maryland residents who also pay income tax to another state.

*Id.* at 539, 890 A.2d 279.

The Blantons relied on *Stern*, but the Court of Appeals noted that following *Stern*, the Legislature "quickly" amended Art. 81, § 290. *Id.* at 542, 890 A.2d 279. The Court wrote: "In February 1975, the Legislature enacted emergency legislation, amended § 290 by adding § 290(b), which provided that only the income tax portion of the State tax could be reduced and no reduction from the local tax portion would be permitted." *Id.* at 541, 890 A.2d 279 (citation omitted). Article 81, § 290(b) then provided, in part:

[W]ith respect to the taxable year 1974 and each taxable year thereafter, the credit provided for by this section operates to reduce only the State income tax payable under this subtitle and does not operate to reduce any local income tax imposed....

When Art. 81, § 290(a) and (b) were recodified as T.G. § 10–703, the language of § 290(b) was deemed unnecessary. *Blanton*, 390 Md. at 542, 890 A.2d 279. Relying on the Revisor's Note, the Court of Appeals explained: "[T]he Legis-

lature intended that the addition of the word 'only' in § 290(a) would replace § 290(b). Further, § 290(b) was deemed 'unnecessary.'" *Id.* at 542, 890 A.2d 279. The Court thus concluded: "[W]e hold that the Legislature did not intend the term 'only against the State income tax' to include local income tax for purposes of credits under § 10–703(a) of the Tax–General Article." *Id.* at 543, 890 A.2d 279.

Contrary to appellants' assertion, in *Blanton* the Court of Appeals did not determine that the local income tax imposed under T.G. § 10–106 was not a State tax for constitutional purposes. Rather, the Court determined that the local income tax did not fall within the meaning of "only against the State income tax" under T.G. § 10–703(a). We perceive nothing in *Blanton* that requires the conclusion that the local income tax is not a State-imposed tax. *Blanton* holds only that the local income tax is not the same as the State income tax within the meaning of T.G. § 10–703(a).

In appellants' case, the Circuit Court for Anne Arundel County correctly noted: "The Court of Appeals' observation in *Blanton* that the State tax and the local tax are two distinct taxes does not mean that they are imposed by different authorities." The State and county taxes are different, but that does not mean that they are not both State taxes. They are imposed by the same authority. The local tax is not imposed by the county, it is imposed by the State. We thus conclude that the local income tax imposed under T.G. § 10–106 is a State tax.

Nor do we perceive any discrimination because the proceeds from the SNRT are distributed to the General Fund of the State, while the proceeds from the local income tax, after certain other distributions are completed, are distributed by the Comptroller to each county. The taxes are both paid to the State and the State distributes the revenue. Moreover, they are both income taxes, that is, general forms of taxation that distribute the expenses of government. *See generally Oregon Waste*, 511 U.S. at 104, 114 S.Ct. 1345 ("[general] tax payments are received for the general purposes of the [gov-

ernment], and are, upon proper receipt, lost in the general revenues") (quoting *Flast v. Cohen*, 392 U.S. 83, 128, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (Harlan, J., dissenting)); *Shaffer v. Carter*, 252 U.S. 37, 51, 40 S.Ct. 221, 64 L.Ed. 445 (1920) ("Income taxes are a recognized method of distributing the burdens of government, favored because requiring contributions from those who realize current pecuniary benefits under the protection of the government, and because the tax may be readily proportioned to their ability to pay."); *Reynolds Metal Co. v. Martin*, 269 Ky. 378, 107 S.W.2d 251, 258 (1937) (Income tax "is a contribution exacted from those domiciled or doing business in the state for the purpose of defraying the expenses of government, the contribution being measured by the ability of the taxpayer to pay, which in turn is determined by the extent of his income. He is required to pay this tax because he is domiciled or doing business in the state, and so enjoys the protection of government, the right to earn a living, to receive, keep, and expend, income, and to be safe in his property and pursuit of happiness."), *appeal dismissed*, 302 U.S. 646, 58 S.Ct. 146, 82 L.Ed. 502 (1937); *Wood v. Tawes*, 181 Md. 155, 166, 28 A.2d 850 (1942) (" 'A tax measured by the net income of residents is an equitable method of distributing the burdens of government among those who are privileged to enjoy its benefits. The tax, which is apportioned to the ability of the taxpayer to pay it, is founded upon the protection afforded by the state to the recipient of the income in his person, in his right to receive the income and in his enjoyment of it when he received.' ") (Quoting *People of the State of New York ex rel. Cohn v. Graves*, 300 U.S. 308, 313, 57 S.Ct. 466, 81 L.Ed. 666 (1937)).

In sum, the income taxes paid, whether under the SNRT imposed upon nonresidents or under the local income tax imposed upon residents, merely distributes the burdens of government upon the individuals who enjoy its benefits. *See Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254, 58 S.Ct. 546, 82 L.Ed. 823 (1938) ("It was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even

though it increases the cost of doing the business[.]") Further, we perceive no unequal treatment of nonresidents in the statutory scheme because nonresidents will never pay more income tax than residents. *See generally Lung v. O'Chesky,* 94 N.M. 802, 617 P.2d 1317, 1319 (1980) (New Mexico Supreme Court agreed with State's position that tax was not discriminatory because nonresidents paid income tax at the same rate as residents and because the State may constitutionally apportion exemptions and deductions in relation to the total income earned within New Mexico) [9].

This was not a position relied upon by the Tax Court, however, and we may affirm the Tax Court only upon the grounds upon which it relied. The SNRT, viewed by itself, is discriminatory, but the Tax Court properly concluded that it was a valid compensatory tax.

### The SNRT is a Compensatory Tax

 The Tax Court focused on *Fulton Corp. v. Faulkner,* 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), in determining that the SNRT was a valid compensatory tax. But, we begin with a discussion of *Oregon Waste Systems, Inc. v. Dep't of Environmental Quality of the State of Oregon,* 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994), because the Supreme Court relied heavily on *Oregon Waste* in reaching its decision in *Fulton.*

At issue in *Oregon Waste* was an Oregon statute that imposed a surcharge on every person who disposed of solid waste generated out-of-state at an in-state disposal site. *Id.* at 96, 114 S.Ct. 1345. The amount of the surcharge was left to the Environmental Quality Commission to determine through rulemaking, but the Oregon Legislature required that the

---

**9.** Appellee also refers us to *Camacho v. Iowa Dep't of Revenue and Finance,* 666 N.W.2d 537 (Iowa 2003), but in that case, there was no allegation that the tax was discriminatory. Rather, the question was whether the tax was fairly apportioned and thus internally consistent under *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), and *Goldberg v. Sweet,* 488 U.S. 252, 261, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). *Camacho,* 666 N.W.2d at 543.

surcharge " 'be based on the costs to the State of Oregon and its political subdivisions of disposing of solid waste generated out-of-state which are not otherwise paid for' under specified statutes." *Id.* (citation omitted). The Commission set the surcharge on out-of-state solid waste at $2.25 per ton. *Id.*

The Oregon Legislature also imposed a fee on the in-state disposal of waste generated in Oregon. *Id.* The in-state fee was capped by statute at $0.85 per ton. *Id.* Thereafter, the Oregon Legislature added the $0.85 per ton fee to out-of-state waste, on top of the $2.25 surcharge, with the proviso that if the surcharge survived judicial challenge, the $0.85 per ton fee would again be limited to in-state waste. *Id.*

The Supreme Court deemed the $2.25 per ton surcharge to be discriminatory on its face. *Id.* at 99, 114 S.Ct. 1345. The Court wrote:

> The surcharge subjects waste from other States to a fee almost three times greater than the $0.85 per ton charge imposed on solid in-state waste. The statutory determinant for which fee applies to any particular shipment of solid waste to an Oregon landfill is whether or not the waste was "generated out-of-state." It is well established, however, that a law is discriminatory if it " 'tax[es] a transaction or incident more heavily when it crosses state lines than when it occurs entirely within the State.' " *[Chemical Waste Management, Inc. v. Hunt,* 504 U.S. 334, 342, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992) ] (quoting *Armco Inc. v. Hardesty,* 467 U.S. 638, 642, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984)).

*Id.* at 99–100, 114 S.Ct. 1345 (some citations omitted).

Because the surcharge was discriminatory, the Supreme Court applied "the virtually *per se* rule of invalidity" legal standard. *Id.* at 100, 114 S.Ct. 1345. Thus, the surcharge had to be invalidated unless the Department of Environmental Quality could " 'sho[w] that it advances a legitimate local purpose that cannot be adequately served by reasonable non-discriminatory alternatives.' " *Id.* at 100–01, 114 S.Ct. 1345 (quoting *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269,

278, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)). The Court added that "justifications for discriminatory restrictions on commerce [must] pass the 'strictest scrutiny.'" *Id.* at 101, 114 S.Ct. 1345 (quoting *Hughes v. Oklahoma,* 441 U.S. 322, 337, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)). Further, "'[t]he State's burden of justification is so heavy that 'facial discrimination by itself may be a fatal defect.'" *Id.* (quoting *Hughes,* 441 U.S. at 337, 99 S.Ct. 1727) (citations omitted).

The Department of Environmental Quality ("the Department") defended the surcharge on out-of-state waste as a "'compensatory tax' necessary to make shippers of such waste pay their 'fair share' of the costs imposed on Oregon by the disposal of their waste in the State." *Id.* at 102, 114 S.Ct. 1345. After setting forth the three-pronged analysis, the Supreme Court determined that the surcharge was not a compensatory tax. *Id.* at 104, 114 S.Ct. 1345. The Court explained:

> Oregon does not impose a specific charge of at least $2.25 per ton on shippers of waste generated in Oregon, for which the out-of-state surcharge might be considered compensatory. In fact, the only analogous charge on the disposal of Oregon waste is $0.85 per ton, approximately one-third of the amount imposed on waste from other States. [The Department's] failure to identify a specific charge on intrastate commerce equal to or exceeding the surcharge is fatal to their claim.

*Id.* (citations omitted). The first and second prongs were thus not met.

The Department asserted that, even without a $2.25 per ton charge on in-state waste, intrastate commerce paid its share of the costs underlying the surcharge through general taxation. *Id.* (footnote omitted). The Supreme Court responded: "Whether or not that is true is difficult to determine, as '[general] tax payments are received for the general purposes of the [government], and are, upon proper receipt, lost in the general revenues.'" *Id.* (quoting *Flast v. Cohen,* 392 U.S. 83, 128, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) (Harlan, J., dissent-

ing)). The Court added: "Even assuming, however, that various other means of general taxation, such as income taxes, could serve as an identifiable intrastate burden roughly equivalent to the out-of-state surcharge, respondents' compensatory tax argument fails because the in-state and out-of-state levies are not imposed on substantially equivalent events." *Id.* That is, the third prong of the analysis was not satisfied.

The Court continued:

The prototypical example of substantially equivalent taxable events is the sale and use of articles of trade. In fact, use taxes on products purchased out of state are the only taxes we have upheld in recent memory under the compensatory tax doctrine. Typifying our recent reluctance to recognize new categories of compensatory taxes is [*Armco Inc. v. Hardesty,* 467 U.S. 638, 642, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984) ], where we held that manufacturing and wholesaling are not substantially equivalent events. 467 U.S., at 643[, 104 S.Ct. 2620]. In our view, earning income and disposing of waste at Oregon landfills are even less equivalent than manufacturing and wholesaling. Indeed, the very fact that in-state shippers of out-of-state waste, such as Oregon Waste, are charged the out-of-state surcharge even though they pay Oregon income taxes refutes respondents' argument that the respective taxable events are substantially equivalent. We conclude that, far from being substantially equivalent, taxes on earning income and utilizing Oregon landfills are "entirely different kind[s] of tax[es]." *Washington v. United States,* 460 U.S. 536, 546, n. 11, 103 S.Ct. 1344, 75 L.Ed.2d 264 (1983).

*Oregon Waste,* 511 U.S. at 105, 114 S.Ct. 1345 (some citations omitted). The Court thus declined "to 'plunge ... into the morass of weighing comparative tax burdens' by comparing taxes on dissimilar events." *Id.* (quoting *American Trucking Assns., Inc. v. Scheiner,* 483 U.S. 266, 289, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987) (internal quotation marks omitted and footnote omitted)).

In *Fulton Corp. v. Faulkner*, 516 U.S. 325, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996), North Carolina imposed an "intangibles tax" on a fraction of the value of corporate stock owned by state residents. The tax was inversely proportional to the income tax the corporation paid to North Carolina. The Supreme Court described how the tax worked:

> [A] corporation doing all of its business within the State would pay corporate income tax on 100% of its income, and the taxable percentage deduction allowed to resident owners of that corporation's stock under the intangibles tax would likewise be 100%. Stock in a corporation doing no business in North Carolina, on the other hand, would be taxable on 100% of its value. For the intermediate cases, holders of stock were able to look up the taxable percentage for a large number of corporations as determined and published annually by the North Carolina Secretary of Revenue (Secretary). In 1990, for example, the Secretary determined the appropriate taxable percentage of IBM stock to be 95%, meaning that IBM did 5% of its business in North Carolina, with its stock held by North Carolina residents being taxable on 95% of its value.

*Fulton*, 516 U.S. at 328, 116 S.Ct. 848 (citation omitted).

Fulton Corp. was a North Carolina company that owned stock in six other corporations, five of which did no business and earned no income in the State. *Id.* As a result, Fulton's stock in those five corporations was subject to the intangibles tax on 100% of its value. *Id.* The sixth corporation in which Fulton held stock conducted 46% of its business in North Carolina; therefore, Fulton's stock in that corporation was subject to an intangibles tax on 54% of its value. *Id.*

Upon considering the intangibles tax, the Supreme Court concluded that it was facially discriminatory:

> There is no doubt that the intangibles tax facially discriminates against interstate commerce. A regime that taxes stock only to the degree that its issuing corporation participates in interstate commerce favors domestic corporations over their foreign competitors in raising capital among

North Carolina residents and tends, at least, to discourage domestic corporations from plying their trades in interstate commerce.

*Id.* at 333, 116 S.Ct. 848.

The Supreme Court went on to consider whether the intangibles tax could be sustained as compensatory. The Court wrote:

> [O]ur cases have distilled three conditions necessary for a valid compensatory tax. First, "a State must, as a threshold matter, 'identif[y] ... the [intrastate tax] burden for which the State is attempting to compensate.'" *Oregon Waste, supra,* 511 U.S., at 103[, 114 S.Ct. 1345] (quoting *Maryland v. Louisiana,* 451 U.S. 725, 758, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981)). Second, "the tax on interstate commerce must be shown roughly to approximate-but not exceed-the amount of the tax on intrastate commerce." *Oregon Waste,* 511 U.S., at 103[, 114 S.Ct. 1345]. "Finally, the events on which the interstate and intrastate taxes are imposed must be 'substantially equivalent'; that is, they must be sufficiently similar in substance to serve as mutually exclusive 'prox[ies]' for each other." *Ibid.* (quoting *Armco Inc. v. Hardesty, supra,* at 643[, 104 S.Ct. 2620] ).

*Fulton,* 516 U.S. at 332–33, 116 S.Ct. 848.

Regarding the first factor, the Supreme Court added: "[A] State that invokes the compensatory tax defense must identify the intrastate tax for which it seeks to compensate, and it should go without saying that this intrastate tax must serve some purpose for which the State may otherwise impose a burden on interstate commerce." *Id.* at 334, 116 S.Ct. 848 (citation omitted). The Secretary of Revenue of North Carolina ("the Secretary") suggested "that the intangibles tax, with its taxable percentage deduction, compensates for the burden of the general corporate income tax paid by corporations doing business in North Carolina." *Id.* at 334, 116 S.Ct. 848. But the Supreme Court commented that because North Carolina had no general sovereign interest in taxing income earned out of state, the Secretary had to "identify some in-

state activity or benefit in order to justify the compensatory levy." *Id.* The Supreme Court added that it had "repeatedly held that 'no state tax may be sustained unless the tax ... has a substantial nexus with the State ... [and] is fairly related to the services provided by the State.' " *Id.* (quoting *Maryland v. Louisiana,* 451 U.S. at 754, 101 S.Ct. 2114).

The Secretary asserted that North Carolina could "impose a compensatory tax upon foreign corporations because they may avail themselves of access to North Carolina's capital markets." *Fulton,* 516 U.S. at 334–35, 116 S.Ct. 848. The Supreme Court summarized the Secretary's position:

> The Secretary's theory is that one of the services provided by the State, and supported through its general corporate income tax, is the maintenance of a capital market for corporations wishing to sell stock to North Carolina residents. Since those corporations escape North Carolina's income tax to the extent those corporations do business in other States, the Secretary says, the State may require those companies to pay for the privilege of access to the State's capital markets by a tax on the value of the shares sold. So, the Secretary concludes, the intangibles tax "rests squarely on 'the settled principle that interstate commerce may be made to pay its way.' "

*Id.* at 335, 116 S.Ct. 848 (citations omitted).

The Supreme Court found the Secretary's argument "unconvincing" and noted that it had rejected a counterpart to it in *Oregon Waste.* The Court reiterated its holding in *Oregon Waste* "that Oregon could not charge an increased fee for disposal of waste generated out of state on the theory that in-state waste generators supported the cost of waste disposal facilities through general income taxes." *Id.* In *Fulton,* 516 U.S. at 335, 116 S.Ct. 848, the Court further discussed *Oregon Waste:*

> Although we relied primarily upon the conclusion that earning income and disposing of waste are not "substantially equivalent taxable events," [*Oregon Waste,* 511 U.S.] at 105,[ 114 S.Ct. 1345] we also spoke of the danger of treating

general revenue measures as relevant intrastate burdens for purposes of the compensatory tax doctrine. "[P]ermitting discriminatory taxes on interstate commerce to compensate for charges purportedly included in general forms of intrastate taxation would allow a state to tax interstate commerce more heavily than in-state commerce anytime the entities involved in interstate commerce happened to use facilities supported by general state tax funds." *Id.*, at 105, n. 8,[ 114 S.Ct. 1345] (internal quotation marks and citation omitted). We declined then, as we do now, "to open such an expansive loophole in our carefully confined compensatory tax jurisprudence." *Ibid.*

The *Fulton* Court was not persuaded that North Carolina's corporate income tax was designed to support the intrastate capital market. *Id.* at 336, 116 S.Ct. 848. Rather, access to those markets was regulated by blue sky laws and their accompanying regulations, which prescribe who may sell securities, the procedures that must be followed, and the fees imposed. *Id.* Without any evidence to the contrary, the Supreme Court assumed that North Carolina "has provided for the upkeep of its capital market through these provisions, not through the general corporate income tax." *Id.* (footnote omitted). The Supreme Court continued:

> If the corporate income tax does not support the maintenance of North Carolina's capital market, then the State has not justified imposition of a compensating levy on the ownership of shares in corporations not subject to the income tax. *While we need not hold that a State may never justify a compensatory tax by an intrastate burden included in a general form of taxation, the linkage in this case between the intrastate burden and the benefit shared by out-of-staters is far too tenuous to overcome the risk posed by recognizing a general levy as a complementary twin.*

*Id.* (Emphasis added).

Although the first prong was not met, the Supreme Court went on to apply the second prong of the analysis, which requires that " 'the tax on interstate commerce ... be shown

roughly to approximate-but not exceed-the amount of the tax on intrastate commerce,'" *Fulton,* 516 U.S. at 333–34, 116 S.Ct. 848 (quoting *Oregon Waste,* 511 U.S. at 103, 114 S.Ct. 1345). The Supreme Court noted that, "[w]hen a corporation doing business in a state pays its general corporate income tax, it pays for a wide range of things: construction and maintenance of the transportation network, institutions that educate the work force, local police and fire protection, and so on." *Fulton,* 516 U.S. at 337, 116 S.Ct. 848. But the Secretary's justification for the intangibles tax rested on only one of the services funded by the corporate income tax, that is, "the maintenance of a capital market for the shares of both foreign and domestic corporations." *Id.* The Supreme Court reasoned that if corporations conduct their business outside the state, "they get little else from the State." *Id.* Accordingly, even if the Supreme Court "suppressed [their] suspicion that North Carolina actually funds its capital markets through its blue sky fees, not its general corporate taxation," the relevant comparison for the Court's analysis was "between the size of the intangibles tax and that of the corporate income taxes component that purportedly funds the capital market." *Id.* at 337–38, 116 S.Ct. 848.

The Supreme Court concluded that such an analysis was "for the present practical purpose impossible." *Id.* at 338, 116 S.Ct. 848. The Court explained:

> The corporate income tax is a general form of taxation, not assessed according to the taxpayer's use of particular services, and before its revenues are earmarked for particular purposes they have been commingled with funds from other sources. As a result, the Secretary cannot tell us what proportion of the corporate income tax goes to support the capital market, or whether that proportion represents a burden greater than the one imposed on interstate commerce by the intangibles tax. True, it is not inconceivable, however unlikely, that a capital markets component of the corporate income tax exceeds the intangibles tax in magnitude, but the Secretary cannot carry her burden of demonstrating this on the record in front of us.

This difficulty simply confirms our general unwillingness to "permi[t] discriminatory taxes on interstate commerce to compensate for charges purportedly included in general forms of intrastate taxation." *Oregon Waste*, 511 U.S., at 105, n. 8[, 114 S.Ct. 1345]. Where general forms of taxation are involved, we ordinarily cannot even begin to make the sorts of quantitative assessments that the compensatory tax doctrine requires.

*Fulton*, 516 U.S. at 338, 116 S.Ct. 848 (one citation omitted).

The Supreme Court then concluded that the intangibles tax also failed the third prong, "which requires the compensating taxes to fall on substantially equivalent events." *Id.* The Court noted that it had previously found such equivalence between sales and use taxes, but in its most recent cases had shown "extreme reluctance to recognize new compensatory categories." *Id.* The Court pointed out that in *Oregon Waste*, it had commented that " 'use taxes on products purchased out of state are the only taxes we have upheld in recent memory under the compensatory tax doctrine.' " *Fulton*, 516 U.S. at 338, 116 S.Ct. 848 (quoting *Oregon Waste*, 511 U.S. at 105, 114 S.Ct. 1345). The Court added:

On the other hand, we have rejected equivalence arguments for pairing taxes upon the earning of income and the disposing of waste, *ibid.*, the severance of natural resources from the soil and the use of resources imported from other States, *Maryland v. Louisiana*, 451 U.S., at 759,[ 101 S.Ct. 2114] and the manufacturing and wholesaling of tangible goods, *Tyler Pipe Industries, Inc. v. Washington State Dept. of Revenue*, 483 U.S. 232, 244, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987); *Armco Inc. v. Hardesty*, 467 U.S., at 642[, 104 S.Ct. 2620]. In each case, we held that the paired activities were not "sufficiently similar in substance to serve as mutually exclusive prox[ies] for each other." *Oregon Waste, supra,* at 103[, 114 S.Ct. 1345] (internal quotation marks and citation omitted).

*Fulton*, 516 U.S. at 338–39, 116 S.Ct. 848.

The Supreme Court thus concluded that the intangibles tax was not functionally equivalent to the corporate income tax.

*Id.* at 339, 116 S.Ct. 848; *see also Armco Inc. v. Hardesty,* 467 U.S. 638, 643, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984) (wholesale gross receipts tax imposed on out-of-state company selling its products in West Virginia discriminated against interstate commerce; tax did not compensate for the higher manufacturing tax imposed on in-state manufacturers because "manufacturing and wholesaling are not 'substantially equivalent events' such that the heavy tax on in-state manufacturers can be said to compensate for the admittedly lighter burden placed on wholesalers from out of state. Manufacturing frequently entails selling in the State, but we cannot say which portion of the manufacturing tax is attributable to manufacturing, and which portion to sales. The fact that the manufacturing tax is not reduced when a West Virginia manufacturer sells its goods out of State, and that it is reduced when part of the manufacturing takes place out of State, makes clear that the manufacturing tax is just that, and not in part a proxy for the gross receipts tax imposed on Armco and other sellers from other States.") (footnote omitted); *Boston Stock Exchange,* 429 U.S. at 331, 97 S.Ct. 599 (amendment to New York State transfer tax statute, which afforded nonresidents a 50% reduction in the rate of tax when the transaction involved an in-state sale of shares and limited the total tax liability of any taxpayer, resident or nonresident, to $350 if it involved a New York sale of shares violated the commerce clause because the "obvious effect of the tax [was] to extend a financial advantage to sales on the New York exchanges at the expense of the regional exchanges"; the tax did not "compensate" for a prior New York tax statute, which taxed a sale and transfer of shares in New York the same as a transaction involving in-state transfer but an out-of-state sale, and, instead, "foreclose[d] tax-neutral decisions and create[d] both an advantage for the exchanges in New York and a discriminatory burden on commerce to its sister states").

Turning to the present case, we conclude that the SNRT is a valid compensatory tax. Under the first prong of the test, the "State must, as a threshold matter, 'identif[y] ... the [intrastate tax] burden for which the State is attempting to

compensate.'" *Oregon Waste,* 511 U.S. at 103, 114 S.Ct. 1345 (quoting *Maryland v. Louisiana,* 451 U.S. at 758, 101 S.Ct. 2114). In finding that the first prong was met, the Tax Court wrote:

> As to prong one of the three prong *Fulton* test, the Comptroller asserts that § 10–106.1., strives to equalize the income tax burden between residents and non-residents, and that non-residents will not pay more than residents who are also subject to a county tax. The Comptroller contends that this alone is sufficient to justify imposing the special non-resident tax. Not surprisingly, Petitioners [appellants] argue that the special non-resident tax is not compensating for any burden imposed on intrastate commerce for which residents are paying the county tax, and fails, therefore, to satisfy the first prong of identifying the intrastate tax burden for which the facially discriminatory tax is compensating. *Fulton,* 516 U.S. at 332, 116 S.Ct. 848. Petitioners argue that the special tax compensates for nothing, and cannot be "fairly related to the services provided by the State [which benefit interstate commerce]." *Id.*

To fully explore these contrasting points-of-view, this Court questioned counsel as to whether the nonresident taxpayer gains any direct or indirect benefit from local services being provided by a Maryland county or Baltimore City. Such local services traditionally include police and fire protection, waste disposal, water and sewer services, and the myriad of other local governmental activities on behalf of people within each local jurisdiction. It was conceded that such local benefits do, in fact, accrue both directly and indirectly to nonresidents [10] while they are present or doing business in a jurisdiction. Obviously, both residents and nonresidents receive these local governmental benefits by mere virtue of their physical presence within a jurisdiction, either in person or as part of a business entity doing business within the jurisdiction. It seems perfectly reason-

---

10. At times, the Tax Court wrote "nonresidents" and, at others, it wrote "non-residents."

able, therefore, for the State to seek compensation for these services from non-residents through the tax system. Although there is no direct mechanism to allocate the special non-resident tax revenue to a particular county, the General Fund of Maryland exists to provide funding for the benefit of all Maryland counties and Baltimore City, selectively, through legislation and through the legislative budgeting process. In this regard, the evidence is clear that the burden on intrastate commerce for which § 10–106.1., is compensating, is the burden of providing local governmental services, directly or indirectly, to all persons or entities physically situate or doing business within its local borders.

Appellants assert that, at oral argument before the Tax Court, counsel for appellants stated that the real estate and personal property taxes paid by the law firm compensated the local jurisdictions for the various governmental services they provided. Appellants further contend that the Tax Court misunderstood the first prong of the *Fulton* test. They refer us to the Supreme Court's acknowledgment in *Fulton* that " 'use taxes on products purchased out of state are the only taxes we have upheld in recent memory under the compensatory tax doctrine.' " *Fulton,* 516 U.S. at 338, 116 S.Ct. 848 (quoting *Oregon Waste,* 511 U.S. at 105, 114 S.Ct. 1345). The Supreme Court continued:

> On the other hand, we have rejected equivalence arguments for pairing taxes upon the earning of income and the disposing of waste, the severance of natural resources from the soil and the use of resources imported from other States, and the manufacturing and wholesaling of tangible goods.

*Fulton,* 516 U.S. at 338–39, 116 S.Ct. 848 (citations omitted).

The difficulty with appellants' position is that the above quoted portions of *Fulton* address the third prong of the compensatory tax analysis and not the first prong. Accordingly, it has no relevance to our determination of whether appellee has met the first prong of the test, that is, whether appellee has adequately identified the intrastate tax burden

for which the State is attempting to compensate. We will, however, consider this argument when we reach the third prong of the compensatory tax analysis.

Appellants also claim that the SNRT does not compensate for any burden imposed on intrastate commerce for which residents pay the county income tax. Appellants further allege that the county income tax is different from the State income tax in several respects. First, unlike the State income tax, which is paid to the General Fund of the State, the county income tax is distributed to the county or Baltimore City where the taxpayer resides. Second, the county or Baltimore City decides how the revenue from the county income tax is to be spent. Third, the revenues are used by the county or Baltimore City for governmental services and purposes while the expenditures from the state income tax are determined by the Governor and the General Assembly. Further, appellants contend, the SNRT is added to the General Fund of the State just as the State income tax is added to the General Fund; therefore, the SNRT is not compensating for any burden imposed on intrastate commerce for which residents pay the county income tax.

Appellee responds that the first prong is met "because the in-state burden that the special nonresident tax is designed to equalize is the total income tax paid by state residents—the combined state and local components of the state income tax."

Here, as found by the Tax Court, the county income tax is the burden on intrastate commerce for which the SNRT is attempting to compensate. The county income tax and the SNRT are imposed on an in-state activity, that is, earning income in Maryland. In addition, both taxes are general revenue taxes designed to support government services. *Cf. Maryland v. Louisiana*, 451 U.S. at 758–59, 101 S.Ct. 2114 (Louisiana's first-use tax did not compensate for the State's severance tax on local production of natural gas; Louisiana has an interest in protecting its natural resources and chose to impose a severance tax on the privilege of severing resources from the soil, but the first-use tax did not meet the same ends

since it was imposed on the severance of resources from the federally owned continental shelf and thus Louisiana has no sovereign interest in being compensated for resources from land it does not own; "[t]he two events are not comparable in the same fashion as a use tax complements a sales tax").

Appellants assert that they already pay real and personal property taxes, but so do residents. Indeed, any individual owning property in Maryland may be subject to property tax. *See* Md.Code (2007), § 6–101(a)(1) of the Tax–Property Article ("Except as otherwise provided in this article, all property located in this State is subject to assessment and property tax and is taxable to the owner of the property."); § 1–101(z) of the Tax Property Article ("property" is defined as "real and personal property"). The SNRT, however, is only equalizing the income tax burden on residents and nonresidents who earn income in Maryland. The fact that appellants pay property taxes does not affect the validity of the SNRT.

Under the second prong of the compensatory tax analysis, "the tax on interstate commerce must be shown roughly to approximate—but not exceed—the amount of the tax on intrastate commerce." *Oregon Waste*, 511 U.S. at 103, 114 S.Ct. 1345. Here, the Tax Court found, in relevant part:

It is clear from the language of the statute [the SNRT], coupled with the existence of county income taxes paid by residents, that non-residents pay no more, and in most cases less, than their resident counterparts.

Petitioners argue that the facial discrimination against non-resident taxpayers is in no way cured or offset by the fact that, in addition to Maryland state income tax, resident taxpayers are also subject to county income taxes. Petitioners find significance in the fact that county income taxes are imposed by each separate county in Maryland, and not by the State of Maryland. Likewise, the counties set their own local tax rate. Petitioners add that the proceeds of all county taxes are remitted to the counties that impose them, and are used exclusively to provide governmental services to residents of those counties. In contrast, the special non-

resident tax is imposed by the State of Maryland, and all proceeds from this tax are distributed to the General Fund of the State of Maryland. In support of this distinction, Petitioners cite *Comptroller of The Treasury v. Edward L. Blanton, Jr., et al.,* 390 Md. 528, 890 A.2d 279 (2006) where the Court of Appeals of Maryland, upholding a Tax Court finding, make[s] it clear that the County income taxes are not just an element of the State income tax, but are rather separate and distinct taxes.

Although it is clear from *Blanton* that the State income tax and the county income tax are separate taxes, this distinction does little to answer the question of whether § 10–106.1., as applied, is unconstitutional. The Court finds the distinction between the state and county income taxes to be irrelevant to the constitutional issue. The facts reveal that the non-resident taxpayers are paying the same rate overall as the resident taxpayers, based on their Maryland income. Viewing this from a federal perspective, the burden on each class of taxpayer is the same overall. For example, if one looks at the border between Maryland and other jurisdictions and asks . . . is a non-resident outsider paying more income tax than an inside resident, simply because he is a non-resident outsider . . . the answer is no, he is not paying more. There is merit, therefore, in the Comptroller's assertion that what matters is not where the revenue is allocated, but rather whether there is a discriminatory burden on nonresidents.

The Comptroller states that numerous cases have sustained state taxes against claims of discrimination, even though[ ] the taxes are calculated in different ways for residents and non-residents. Thus in *Shaffer v. Carter,* 252 U.S. 37, 40 S.Ct. 221, 64 L.Ed. 445 (1920), the court sustained a tax calculation method that was different for a non-resident and only allowed him to deduct losses from operations within the taxing state. Under this rule, states are free to limit non-residents to deductions related to income within the taxing state, even if deductions allowed to residents are not so limited. Additional case examples were cited which need not be described here.

The Comptroller's position is that a distinction in the direction of funds does not affect the amount Petitioners pay, and therefore cannot be unconstitutional discrimination. In support of this assertion, the Comptroller cites *Lundi[n]g v. N.Y. Tax Appeals Tribunal,* 522 U.S. 287, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998) for the proposition that states must be afforded a "considerable amount of leeway in aligning the tax burden of nonresidents to in-state activities." Indeed, a reference in *Fulton* supports this same contention. Quoting Justice Cardozo in *Gregg Dyeing Co. v. Query,* 286 U.S. 472, 480, 52 S.Ct. 631, 76 L.Ed. 1232 (1932), explaining a compensatory tax scheme, "the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one activity or incident, and the other upon another, but the sum is the same when the reckoning is closed." § 10–106.1. ensures that non-residents pay Maryland income taxes at the same rate or lesser rate as Maryland residents, albeit the revenue derived from this taxation is distributed differently once collected.

Appellants claim that the Tax Court erred in concluding that the State income tax combined with the SNRT paid by the nonresident is not greater than the sum of the State income tax and county income tax paid by the resident. Appellants insist that this analysis fails because the SNRT is not the same as the county income tax, that is, they are collected by two different governments and the county income tax is spent by the county or Baltimore City.

Appellants also contend that in *Fulton* the Supreme Court "rejected a similar argument with respect to the Intangibles tax." Relying on *Fulton,* appellants claim that appellee cannot demonstrate "what portion of the SNRT goes to support the various services that the Tax Court noted as being provided in the City of Baltimore[ ]" where the law firm has its Maryland offices. Appellants assert that "[t]he SNRT, like the income tax, is commingled with funds from other sources, and it is impossible to track it to any particular expenditure."

They allege that the two cases cited by the Tax Court, *Shaffer v. Carter*, 252 U.S. 37, 40 S.Ct. 221, 64 L.Ed. 445 (1920), and *Lunding v. New York Tax Appeals Tribunal*, 522 U.S. 287, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998), do not support the Tax Court's conclusions.

Appellee states only that the second prong of the compensatory tax analysis is satisfied "because the relevant burden is the total or combined burden: the state portion and the local portion for the resident, and the state portion and the tax of § 10–106.1 for the nonresident."

In the present case, the SNRT very closely approximates the county income tax imposed on residents. In addition, because the SNRT is tied to the lowest possible county income tax rate, a nonresident will never pay more Maryland income tax than a resident pays. In addition, the SNRT and the county income tax are not collected by different governments. They are both collected by the State. All the funds are commingled before distributions are made. Finally, the taxes pay for the services provided by government, whether at the State or county level.

This stands in marked contrast to the intangibles tax at issue in *Fulton*. There, the Secretary asserted that the intangibles tax was imposed to support the capital market within the State and that it compensated for the general corporate income tax paid by corporations doing business in the State. 516 U.S. at 334, 116 S.Ct. 848. When a corporation pays income tax, it pays for a wide variety of governmental services, such as, the construction and maintenance of the transportation network and police and fire protection. *Id.* at 337, 116 S.Ct. 848. Although the Supreme Court suspected that the capital market was funded by North Carolina's blue sky fees, it commented that the Secretary could not show "what portion of the corporate income tax goes to support the capital market, or whether that portion represents a burden greater than the one imposed on interstate commerce by the intangibles tax." *Id.* at 338, 116 S.Ct. 848.

In contrast, in the present case, the SNRT and the county income tax are both income taxes. All of the funds are

collected by the State, commingled, and then distributed to provide governmental services. The funds collected from the county income tax are not earmarked in the same way that the funds collected from the intangibles tax were earmarked.

In *Fulton*, the Supreme Court briefly discussed *Henneford v. Silas Mason Co.*, 300 U.S. 577, 57 S.Ct. 524, 81 L.Ed. 814 (1937), which, in turn, relied on and quoted Justice Cardozo in *Gregg Dyeing Co. v. Query*, 286 U.S. 472, 480, 52 S.Ct. 631, 76 L.Ed. 1232 (1932). In *Henneford*, 300 U.S. at 580, 57 S.Ct. 524, the Supreme Court upheld a use tax imposed by Washington State on the privilege of using any article of tangible personal property within the state. Exempt from the use tax was tangible personal property that had already been subject to a sales tax equal to or greater than the use tax. *Id.* at 581, 57 S.Ct. 524. In effect, the use tax applied only to goods purchased outside of Washington State. *Id.* The use tax was facially discriminatory, but the combined effect of the sales and use taxes ensured that interstate and intrastate commerce were subject to equal burdens. The Court wrote, *id.* at 583–84, 57 S.Ct. 524:

> Equality is the theme that runs through all the sections of the statute. There shall be a tax upon the use, but subject to an offset if another use or sales tax has been paid for the same thing. This is true where the offsetting tax became payable to Washington by reason of purchase or use within the state. It is true in exactly the same measure where the offsetting tax has been paid to another state by reason of use or purchase there. No one who uses property in Washington after buying it at retail is to be exempt from a tax upon the privilege of enjoyment except to the extent that he has paid a use or sales tax somewhere. Every one who has paid a use or sales tax anywhere, or, more accurately, in any state, is to that extent to be exempt from the payment of another tax in Washington.

When the account is made up, the stranger from afar is subject to no greater burdens as a consequence of ownership than the dweller within the gates. The one pays upon one

activity or incident, and the other upon another, but the sum is the same when the reckoning is closed. Equality exists when the chattel subjected to the use tax is bought in another state and then carried into Washington. It exists when the imported chattel is shipped from the state of origin under an order received directly from the state of destination. In each situation the burden borne by the owner is balanced by an equal burden where the sale is strictly local. 'There is no demand in (the) Constitution that the state shall put its requirements in any one statute. It may distribute them as it sees fit, if the result, taken in its totality, is within the state's constitutional power.' *Gregg Dyeing Co. v. Query,* 286 U.S. 472, 480, 52 S.Ct. 631, 76 L.Ed. 1232 (1932).

In the present case, equality is also the theme that runs through the income tax statutes.

We further conclude that the Tax Court committed no error in citing to *Shaffer* and *Lunding.* In those cases, the Supreme Court discussed the states' abilities to tax residents and nonresidents as each must pay for the government services from which they benefit. The Court noted, as we have already discussed, *supra,* that the effect of the tax is the critical consideration. *See generally Lunding,* 522 U.S. at 297, 118 S.Ct. 766 (1998) ("Because state legislatures must draw some distinctions in light of 'local needs,' they have considerable discretion in formulating tax policy.") (Citation omitted); *Shaffer,* 252 U.S. at 55, 40 S.Ct. 221 ("[W]here the question is whether a state taxing law contravenes rights secured by [the Federal Constitution], the decision must depend not upon any mere question of form, construction, or definition, but upon the practical operation and effect of the tax imposed.") (Citations omitted); *see also Brown–Forman Distillers Corp.,* 476 U.S. at 579, 106 S.Ct. 2080 ("the critical consideration is the overall effect of the statute on both local and interstate activity") (citation omitted); *St. Louis Southwestern Ry. Co. v. Arkansas,* 235 U.S. 350, 362, 35 S.Ct. 99, 59 L.Ed. 265 (1914) ("[W]hen the question is whether a tax imposed by a State deprives a party of rights secured by the Federal Constitution, ... [w]e must regard the substance,

rather than the form, and the controlling test is to be found in the operation and effect of the law as applied and enforced by the state.") (Citations omitted). Moreover, as asserted by appellee, the effect of the SNRT, when considered in light of the county income tax paid by residents, is to ensure that equal income tax burdens are carried by residents and nonresidents. Indeed, in many instances the tax paid by the nonresident under the SNRT will be less than the county income tax paid by the resident.

Appellants focus on the specific facts of *Shaffer* and *Lunding* to assert that the Tax Court erred in relying on those cases. But, as the Supreme Court has explained, the Commerce Clause involves a case-by-case analysis. To be sure, we may analogize from other cases, but the Tax Court cited to *Shaffer* and *Lunding* merely to express certain basic principles of taxation. The Tax Court was not asserting that the facts of those cases applied to the present case. There was no error.

Under the third prong of the compensatory tax analysis, the Tax Court concluded:

> The third prong of the compensatory tax doctrine requires that "the events on which the interstate and intrastate taxes are imposed must be 'substantially equivalent'; that is, they must be sufficiently similar in substance to serve as mutually exclusive prox[ies] for each other." *Fulton*, 516 U.S. at 333[, 116 S.Ct. 848]. With respect to § 10–106.1., income is the event on which the tax is based for both residents and non-residents. Being the same event for both classes of taxpayer, it meets the test for "substantially equivalent." Hence, the third prong of the three-part test under *Fulton* is also satisfied, and this Court finds that § 10–106.1. is a valid compensatory tax.

Appellants contend that the Tax Court erred in finding substantial equivalence. They assert that although income for both residents and nonresidents is being taxed, there is no substantial equivalence because the SNRT is imposed by the State, but the county income tax is levied by the counties or Baltimore City. They thus claim that the SNRT and the

county income tax are wholly different from sales and use taxes, which, as noted in *Fulton,* 516 U.S. at 338, 116 S.Ct. 848, do fall on substantially equivalent events. In *Fulton,* the Supreme Court also explained:

> Although we found such equivalence in the sales/use tax combination at issue in *Silas Mason,* our more recent cases have shown extreme reluctance to recognize new compensatory categories. In *Oregon Waste,* we even pointed out that 'use taxes on products purchased out of state are the only taxes we have upheld in recent memory under the compensatory tax doctrine.' 511 U.S., at 105[, 114 S.Ct. 1345]."

516 U.S. at 338, 116 S.Ct. 848.

Appellants also refer us to two out-of-state cases, *Annenberg v. Commonwealth,* 562 Pa. 581, 757 A.2d 338 (2000), and *General Motors Corp. v. FTB,* 120 Cal.App.4th 114, 16 Cal. Rptr.3d 41 (2004), in support of their position.[11]

We conclude that the Tax Court committed no error in determining that there was substantial equivalence because income was the taxing event for both nonresidents and residents. These events are identical and thus may serve as proxies for each other. *Compare Oregon Waste,* 511 U.S. at 105, 114 S.Ct. 1345 (rejecting equivalence argument for pairing taxes on earning income and disposing of waste); *Maryland v. Louisiana,* 451 U.S. at 759, 101 S.Ct. 2114 (rejecting pairing of taxes for severance of natural resources and the use of resources imported from other states); *Tyler Pipe Indus.,* 483 U.S. at 244, 107 S.Ct. 2810 (rejecting pairing of taxes for the manufacturing and wholesaling of tangible goods). Further, the parties taxed are the same, that is, individuals earning income in Maryland.

---

11. Appellants attack the circuit court opinion at this point and assert that the circuit court "refused to address the *Fulton* case, and substituted its notion that if the county tax and the State income tax are both imposed by the same taxing authority the SNRT is constitutional." (Footnote omitted). Appellants claim that the circuit court glossed over the fact that the counties and Baltimore City are recipients of the county tax, but that the State is the recipient of the SNRT. Under the standard of review, however, we review the conclusions of the Tax Court and not the circuit court.

In addition, as discussed *supra*, the county income tax and the SNRT are State taxes. That the counties set the tax rate of the county income tax does not alter this conclusion. Moreover, to the extent that there is a distinction to be drawn from the distribution of the funds, we note that the funds are not earmarked for any specific use. Rather, the SNRT and the county income tax are collected by the State, all monies are commingled and, eventually, the county income tax is distributed to the counties or Baltimore City and the SNRT is applied to the General Fund of the State. These revenues are thus used to provide governmental services whether by the State, counties, or Baltimore City. In contrast, the intangibles tax in *Fulton* was imposed to pay for the privilege of access to the capital market while the corporate income tax paid for a wide range of government services. 516 U.S. at 334–35, 337, 116 S.Ct. 848.

Nor do the two out-of-state cases to which appellants refer us offer them any relief. In *Annenberg*, a personal property tax imposed on certain shares of stock was at issue. The net effect of the "stock clause" was that the only stock that an owner was liable to pay tax on was stock in foreign corporations that did no business in Pennsylvania. 757 A.2d at 341 n. 4. The Supreme Court of Pennsylvania concluded that the tax was facially discriminatory and that the stock clause was not a valid compensatory tax. *Id.* at 345. Regarding the three-pronged analysis, the Pennsylvania Supreme Court held that none of the prongs were met.[12] *Id.* at 343–46.

Under the first prong, "the Counties"[13] argued that "the legislature crafted the stock clause as part of a comprehensive taxing scheme in order to compensate for the taxes exacted by the capital stock and franchise taxes." *Id.* at 343. The capital

---

**12.** As noted, appellants contend that because the parties stipulated to the facts, we review the decision of the Tax Court *de novo.* In *Annenberg*, the Pennsylvania Supreme Court noted that "the inquiry into whether the stock clause is a compensatory tax is largely factual...." 757 A.2d at 342.

**13.** The Pennsylvania Supreme Court had found that the tax was facially discriminatory and remanded the case to the Court of Common Pleas of

stock tax applied to companies organized under the law of Pennsylvania, and the franchise tax was owed by entities organized in any jurisdiction other than Pennsylvania that also did business in and were liable to taxation in Pennsylvania. *Id.* at 341 n. 4.

The Pennsylvania Supreme Court rejected the Counties' argument for two reasons. First, the stock clause was not part of a comprehensive scheme. *Id.* at 343. The Pennsylvania Supreme Court traced the development of the Commonwealth's first personal property tax and its first capital stock tax, which dated from 1831 and 1840, respectively. *Id.* The Court concluded that the "taxes were not an integrated, comprehensive system of taxation." *Id.* at 344. Rather, they developed independent of each other. *Id.* The evidence thus did not support the contention that the legislature had enacted the taxes as part of an interconnected scheme. *Id.* Second, the Pennsylvania Supreme Court concluded that the Counties did not establish that the stock clause tax " 'is fairly related to the services provided by the State [which benefit interstate commerce].' " *Id.* (quoting *Fulton*, 516 U.S. at 334, 116 S.Ct. 848.) The Court wrote:

> Some of the Counties attempted to show that they provided services which benefited interstate commerce by showing that they provided services which corporations not doing business in Pennsylvania arguably utilized. However, none of the Counties established to what extent these services were provided to or utilized by corporations not doing business in Pennsylvania. Thus, we are unable to determine whether the tax imposed by the stock clause "is fairly related to the services" provided by the Counties.

*Annenberg*, 757 A.2d at 344 (citation omitted).

When considering the second prong, the Supreme Court of Pennsylvania stated that the Counties were required to "es-

---

Montgomery County for a hearing and an interim report to be issued on whether the stock clause was a compensatory tax. 757 A.2d at 341. At the hearing, the Annenbergs and boards of numerous Pennsylvania counties participated, which is why the Pennsylvania Supreme Court referred to "the Counties." *Id.* at 342.

tablish that the tax imposed by the facially discriminatory stock clause roughly approximates, but does not exceed, the amount of the tax burden which the capital stock tax and the franchise tax impose." *Id.* at 334 (citing *Fulton,* 516 U.S. at 332–33, 116 S.Ct. 848.) The Counties had presented the testimony of an expert witness who asserted that most of the monies collected through the capital stock and franchise taxes went to the general fund, which was distributed on a state-wide basis. *Annenberg,* 757 A.2d at 344. The remaining amount went to the Lottery Fund and the Hazardous Sites Cleanup Fund. *Id.* During one of the years in question, approximately 40% of the general fund was distributed to the local governments. *Id.* The expert witness compared this figure to the rate levied by the personal property tax and "concluded that the personal property tax roughly approximates, but does not exceed, the amount of the tax burden which the capital stock tax and the franchise tax impose." *Id.*

The Pennsylvania Supreme Court was not persuaded by the expert witness. First, the Court noted that the expert failed to recognize "that the money distributed from the general fund to local governments is distributed not only to counties, which may collect the personal property tax, but also to municipalities, townships and school districts, which in general may not collect the personal property tax." *Id.* at 345 (foot-note omitted). It was thus impossible to determine how much of that 40% "was distributed to the Counties and thus could possibly be seen as a counterpart to the allegedly compensatory personal property tax, and which portion was distributed to local entities which cannot collect the personal property tax and thus could in no fashion be seen as a counterpart to the personal property tax." *Id.* at 345.

Second, the Supreme Court of Pennsylvania found a problem with the expert witness's calculations because not all the Counties collected the personal property tax. *Id.* at 345. As a result,

> [i]n order to give an accurate representation of whether the taxes collected by the personal property tax are in parity with the portion of the capital stock and franchise taxes the

counties receive from the general fund, the witness would have had to calculate how much the counties which collect the personal property tax receive from the general fund, and exclude from his calculations how much the general fund distributes to the counties which do not collect the personal property tax.

*Id.*

Upon considering the third prong, the Pennsylvania Supreme Court concluded that the taxes were not substantially equivalent, that is, that they could not be considered proxies for each other. *Id.* This was because the personal property tax was based on the value of the shares on one day, but the capital stock and franchise taxes were determined "by measuring economic flow." *Id.* Further, the taxes were "imposed and utilized by different levels of government." *Id.* The Pennsylvania Supreme Court explained: "The personal property tax is imposed at the county level and is utilized for county purposes. The capital stock and franchise taxes, on the other hand, are imposed at the state level and are utilized for state purposes." *Id.* at 345–46 (footnote omitted).

The Pennsylvania Supreme Court concluded, *id.* at 346:

The Counties have failed to carry their burden of establishing that the stock clause of the personal property tax is a compensatory tax. We are thus compelled to find that the portion of the stock clause which excludes from the personal property tax stock held in companies which are subject to the capital stock and franchise taxes is unconstitutional as it violates the Commerce Clause of the United States Constitution.

*Id.* at 346.

In contrast to the present case, in *Annenberg* a tax was imposed on stock on corporations not doing any business in the Commonwealth of Pennsylvania. Here, the law firm does business in the Maryland and appellants earn income in Maryland. Also, in *Annenberg* the personal property tax was imposed at the county level, but, in Maryland, the county income tax is imposed by the State and is collected by the

State. Although the funds are distributed differently, they are all used to provide governmental services, which benefit the law firm.

Appellants also refer us to *General Motors Corp. v. Franchise Tax Bd.*, 16 Cal.Rptr.3d 41 (Cal.Ct.App.2004), *aff'd in part and rev'd in part on other grounds*, 39 Cal.4th 773, 47 Cal.Rptr.3d 233, 139 P.3d 1183 (2006). At issue in that case was the California Revenue and Tax Code § 24402, which allowed "a corporate taxpayer to deduct a portion of the dividends it receives from another corporation if the dividends were included in dividend payer's measure of California franchise tax." *General Motors Corp.*, 16 Cal.Rptr.3d at 56. The California Court of Appeal concluded that the tax was discriminatory on its face

> "because it affords to taxpayers a deduction for dividends received from corporations subject to tax in California, while no deduction is afforded for dividends received from corporations not subject to tax in California. As a result, the dividends received deduction scheme favors dividend-paying corporations doing business in California and paying California taxes over dividend-paying corporations which do not do business in California and pay no taxes in California. The deduction thus discriminates between transactions on the basis of an interstate element, which is facially discriminatory under the commerce clause."

*Id.* at 57 (quoting *Farmer Bros. Co. v. Franchise Tax Bd.*, 108 Cal.App.4th 976, 986–87, 134 Cal.Rptr.2d 390 (Cal.Ct.App. 2003)) (citation omitted).

The Franchise Tax Board ("FTB") asserted that § 24402 was a valid compensatory tax, but the California Court of Appeal held that none of the prongs under that analysis was met. *General Motors Corp.*, 16 Cal.Rptr.3d at 58–59. Under the first prong, the Court rejected the FTB's claim that the dividends received deduction avoided double taxation on out-of-state corporate income. *Id.* at 58. The Court cited to

*Farmer Bros.*, 108 Cal.App.4th at 991, 134 Cal.Rptr.2d 390,[14] which pointed out that "the double taxation argument also ignores the corporate income tax that an out-of-state corporation's state might impose." Further, the FTB was unable to identify an in-state benefit to the taxpayers. *General Motors Corp.*, 16 Cal.Rptr.3d at 58. The California Court of Appeal again cited to *Farmer Bros.*, which relied on *Fulton* to hold that it was inappropriate to permit " ' "discriminatory taxes on interstate commerce to compensate for charges purportedly included in general forms of intrastate taxation" ' " because it " ' "would allow a state to tax interstate commerce more heavily than in-state commerce anytime the entities involved in interstate commerce happened to use facilities supported by general state tax funds." ' " *Farmer Bros.*, 108 Cal.App.4th at 990, 134 Cal.Rptr.2d 390 (quoting *Fulton*, 516 U.S. at 335, 116 S.Ct. 848 (quoting *Oregon Waste*, 511 U.S. at 105 n. 8, 114 S.Ct. 1345)).

In considering the second prong, the Court again cited to *Farmer Bros.* to conclude that the FTB had not met its burden. *General Motors Corp.*, 16 Cal.Rptr.3d at 58. In *Farmer Bros.*, the California Court of Appeal relied on the Supreme Court's analysis in *Oregon Waste* and *Fulton*, which explained the difficulty of satisfying the second prong "when the state contends that the tax burden on interstate commerce compensates for the burden of state income taxes." *Farmer Bros.*, 108 Cal.App.4th at 990, 134 Cal.Rptr.2d 390. The *Farmer Bros.* Court noted that "[w]hether or not the interstate tax burden roughly approximates the intrastate tax burden 'is difficult to determine, as "[general] tax payments are received for the general purposes of the [government], and are, upon proper receipt, lost in the general revenues." ' " *Farmer Bros.*, 108 Cal.App.4th at 990, 134 Cal.Rptr.2d 390 (quoting *Oregon Waste*, 511 U.S. at 104, 114 S.Ct. 1345

---

**14.** *General Motors Corp.*, 16 Cal.Rptr.3d 41, relied heavily on *Farmer Bros.*, 108 Cal.App.4th 976, 134 Cal.Rptr.2d 390, which also concluded that § 24402 violated the Commerce Clause. 108 Cal.App.4th at 980, 993, 134 Cal.Rptr.2d 390.

(quoting *Flast,* 392 U.S. at 128, 88 S.Ct. 1942 (Harlan, J., dissenting))).

The *General Motors* Court concluded that the FTB also failed to satisfy the third prong of the compensatory tax analysis:

"[The] FTB argues that this condition is met because corporate income and the dividend paid from that income are the 'same dollars' and are substantially similar events. Yet, *Fulton* expressly disapproved of this analysis with respect to the intangibles tax. '[W]e find that the intangibles tax is not functionally equivalent to the corporate income tax.' (*Fulton, supra,* 516 U.S. at p. 339[, 116 S.Ct. 848].) Because the objective of the equivalent-event requirement is to enable in-state and out-of-state businesses to compete on an equal footing, '[t]his equality of treatment does not appear when the allegedly compensating taxes fall respectively on taxpayers who are differently described, as, for example, resident shareholders and corporations doing business out of state. A State defending such a tax scheme as one of complementary taxation, therefore, has the burden of showing that the actual incidences of the two tax burdens are different enough from their nominal incidences so that the real taxpayers are within the same class, and that therefore a finding of combined neutrality on interstate competition would at least be possible.' (*Id.* at p. 340[, 116 S.Ct. 848].) The court in Fulton noted that determining whether the tax burden is shifted out of state, rather than borne by in-state producers and consumers, requires complex factual inquiries, and that courts as institutions are poorly equipped to evaluate with precision the relative burdens of various methods of taxation. (*Fulton, supra,* 516 U.S. at pp. 341–342[, 116 S.Ct. 848].) 'Indeed, the general difficulty of comparing the economic incidence of state taxes paid by different taxpayers upon different transactions goes a long way toward explaining why we have so seldom recognized a valid compensatory tax outside the context of sales and use taxes.' (*Id.* at p. 342[, 116 S.Ct. 848].)" (*Farmer Bros., supra,* 108 Cal.App.4th at p. 992, 134 Cal.Rptr.2d 390.)

*Farmer Bros.* thus explains that the "FTB must establish that the burden created by the structure of the dividends received deduction falls on the same class of taxpayers as does the corporate income tax. Yet the burden of section 24402 is on the taxpayer receiving dividends, while the burden of the corporate income tax is on the payer corporation. [The] FTB has failed to offer any factual or logical support for its claim that the actual incidences of these two taxes are imposed upon the same class of taxpayers (*see Fulton, supra,* 516 U.S. at p. 340, fn. 6[, 116 S.Ct. 848]) or that the dividends received deduction amounts to a clear equivalent for the corporate income tax." (*Farmer Bros., supra,* 108 Cal.App.4th at p. 992, 134 Cal.Rptr.2d 390.)

*General Motors Corp.,* 16 Cal.Rptr.3d at 58–59.

Here, in contrast to *General Motors,* the tax burden falls on the same class of taxpayers—those individuals earning income in Maryland. *See General Electric Co. v. Commissioner, New Hampshire Dep't of Revenue Admin.,* 154 N.H. 457, 914 A.2d 246, 248, 257–58 (2006) (statute that "permits a parent corporation to take a deduction for dividends received from its corporate subsidiaries when the gross business profits of the subsidiaries have already been subject to tax in New Hampshire[ ]" was not facially discriminatory when New Hampshire's taxing regime was viewed as a whole and the aggregate tax imposed on a unitary business was considered; the Commerce Clause was not violated because under the taxing scheme, "both the unitary business with the foreign subsidiary operating in New Hampshire and the unitary business with the foreign subsidiary not operating in New Hampshire are each only taxed once, there is no 'differential treatment' that benefits the former and burdens the latter, *Oregon Waste,* 511 U.S. at 99, 114 S.Ct. 1345; the latter is not taxed more heavily than the former, *Fulton,* 516 U.S. at 331, 116 S.Ct. 848; and the former is not given a 'direct commercial advantage' over the latter, *Boston Stock Exchange,* 429 U.S. at 329, 97 S.Ct. 599 (quotation omitted).").

Appellant also refers us to several cases that they argued to the Tax Court and circuit court, but which those courts did not address in their written opinions. They rely on *Comptroller of the Treasury v. Armco, Inc.*, 70 Md.App. 403, 521 A.2d 785 (1987), *disapproved on other grounds, Ins. Comm'r of the State of Maryland v. The Equitable Life Assurance Society of the United States*, 339 Md. 596, 624 n. 12, 664 A.2d 862 (1995), to assert that the SNRT is discriminatory. In *Armco*, this Court found unconstitutional as violative of the Commerce Clause a statute that granted a tax exclusion to a parent corporation conducting more than 50% of its business in Maryland. *Id.* In contrast, a parent corporation conducting less than 50% of its business in Maryland would be taxed on the allocable portion of the income deemed distributed from its Domestic International Sales Corporation ("DISC").[15] We held: "Because the tax exclusion impermissibly discriminates on the basis of location of a corporation's business, it is unconstitutional." *Id.* at 413, 521 A.2d 785.

In *Armco*, however, the Comptroller asserted that the tax exclusion was "a legitimate attempt by the legislature to exempt income from taxation when a risk of double taxation exists." *Id.* (footnote omitted). The Comptroller did not assert that the challenged statute was a valid compensatory tax and this Court performed no such analysis.

---

15. In *Armco*, we explained the nature of a DISC:

DISCs are purely fictional subsidiary corporations that afford their U.S.-based parent tax incentives to increase their exports. These "federal phantasms" have no assets, no property, and no personnel; they are hollow bookkeeping entities that serve to isolate export profits of a domestic enterprise. The profits so isolated are eligible for preferential tax treatment. Only a portion of this profit-the deemed dividend-is taxed currently to the parent company, the rest-the accumulated income-is not taxed to either the parent or the DISC until it is actually distributed to the parent (the shareholder), or until the DISC no longer exists. As a result, under the federal tax scheme, no income is taxed to the DISC itself. The parent corporation is thus able to defer tax payment on a portion of its profits which would otherwise be immediately taxable. The parent can use the DISC's accumulated income for further export activities without losing the tax benefit.

*Armco*, 70 Md.App. at 406–07, 521 A.2d 785 (footnote omitted).

Appellants also refer us to *Maryland v. Louisiana, supra,* 451 U.S. 725, 101 S.Ct. 2114, 68 L.Ed.2d 576 (1981), in which the Supreme Court wrote:

The State's right to tax interstate commerce is limited .... and no state tax may be sustained unless the tax: (1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the State.

*Id.* at 754, 101 S.Ct. 2114 (citation omitted). The Supreme Court concluded that the first-use tax at issue was discriminatory and Louisiana attempted to defend it as a compensatory tax, but the Court concluded that it could not be justified as a compensatory tax. *Id.* at 758–59, 101 S.Ct. 2114.

Appellants focus on the third part of the analysis in *Maryland v. Louisiana* and assert that the SNRT discriminates against interstate commerce because it is imposed exclusively on nonresident taxpayers and causes nonresidents to pay Maryland State income tax at a substantially higher rate than resident taxpayers. They claim that the higher rate imposed upon nonresidents is as discriminatory against them as the tax was in *Armco.*

Here, if the SNRT is examined alone, it is discriminatory. We thus agree with appellants on that point, but that does not end our analysis because we must then proceed with the compensatory tax analysis. As explained, *supra,* the SNRT is a valid compensatory tax and nonresident taxpayers do not pay Maryland income tax at a higher rate than resident taxpayers.

Appellants also refer us to *Oregon Waste, supra,* 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994), *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue and Fin.,* 505 U.S. 71, 112 S.Ct. 2365, 120 L.Ed.2d 59 (1992), and *Halliburton Oil Well Cementing Co. v. Reily,* 373 U.S. 64, 71, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963), to assert that the comparison to be made in the case before us "is between a Maryland resident and a non-resident as to the amount of Maryland State income tax that each is paying." We disagree. The SNRT is imposed by

the State, as is the county income tax. Only the rate of the county income tax is set by the county or Baltimore City. The State collects the SNRT and the county income tax, the funds are commingled, and then distributed. We thus conclude that the SNRT is a valid compensatory tax for the county income tax.

Further, the above cases offer appellants no relief. In *Kraft*, Kraft General Foods challenged Iowa's tax on the dividends it received from six subsidiaries, each of which was incorporated and conducted business in a foreign country. 505 U.S. at 72, 112 S.Ct. 2365. Iowa did not, however, tax the dividends received from domestic subsidiaries. *Id.* at 73, 112 S.Ct. 2365. The question was thus "whether the disparate treatment of dividends from foreign and from domestic subsidiaries violates the Foreign Commerce Clause." [16] *Id.* (footnote omitted).

Iowa asserted that its tax system did not violate the Commerce Clause because it did not favor local interests. *Id.* at 78, 112 S.Ct. 2365. The Supreme Court set forth Iowa's position:

> To the extent corporations do business in Iowa, an apportioned share of their entire corporate income is subject to Iowa tax. In the case of a foreign subsidiary doing business abroad, Iowa would tax the dividends paid to the domestic parent, but would not tax the subsidiary's earnings. Summarizing this analysis, Iowa asserts: "More earnings of the domestic subsidiary, which has income producing activities in Iowa, than earnings of the foreign subsidiary, which has no Iowa activities, are included in the preapportioned net income base for the unitary [17] business as a whole." Far

---

**16.** "The Congress shall have Power ... To regulate Commerce with foreign Nations...." U.S. Const., Art. 1, § 8.

**17.** "By its nature, a unitary business is characterized by a flow of value among its components." *Kraft,* 505 U.S. at 76, 112 S.Ct. 2365 (citation omitted).

from favoring local commerce, Iowa argues, the tax system places additional burdens on Iowa businesses.

*Id.* at 78–79, 112 S.Ct. 2365 (citation omitted).

The Supreme Court did not find this position persuasive:

We agree that the statute does not treat Iowa subsidiaries more favorably than subsidiaries located elsewhere. We are not persuaded, however, that such favoritism is an essential element of a violation of the Foreign Commerce Clause. In *Japan Line, Ltd. v. County of Los Angeles,* 441 U.S. 434[, 99 S.Ct. 1813, 60 L.Ed.2d 336] (1979), we concluded that the constitutional prohibition against state taxation of foreign commerce is broader than the protection afforded to interstate commerce, *id.,* at 445–446[, 99 S.Ct. 1813], in part because matters of concern to the entire Nation are implicated, *id.,* at 448–451[, 99 S.Ct. 1813]. Like the Import–Export Clause, the Foreign Commerce Clause recognizes that discriminatory treatment of foreign commerce may create problems, such as the potential for international retaliation, that concern the Nation as a whole. *Id.,* at 450[, 99 S.Ct. 1813]. So here, we think that a State's preference for domestic commerce over foreign commerce is inconsistent with the Commerce Clause even if the State's own economy is not a direct beneficiary of the discrimination. As the absence of local benefit does not eliminate the international implications of the discrimination, it cannot exempt such discrimination from Commerce Clause prohibitions.

*Kraft,* 505 U.S. at 79, 112 S.Ct. 2365.

Here, appellants claim that in *Kraft* "the Supreme Court is saying that there does not have to be a local benefit result in order for the tax imposed to be considered discriminatory." We disagree. The Supreme Court was clearly relying on the Foreign Commerce Clause, which is not at issue in the present case. Under *Kraft,* it is only under the Foreign Commerce Clause that, even in the absence of a local benefit, the discrimination may nonetheless still carry international implications. Such concerns are not present in appellants' case.

Appellants refer us to another portion of *Kraft*, in which Iowa asserted that its tax system did not favor business activity in the United States over business activity abroad. *Kraft*, 505 U.S. at 79, 112 S.Ct. 2365. The Supreme Court responded:

> If true, this would indeed suggest that the statute does not discriminate against foreign commerce. We are not convinced, however, that this description adequately characterizes the relevant features of the Iowa statute. It is true that if a subsidiary were located in another State, its earnings would be subject to taxation by the Federal Government and by the other State (assuming that the State was one of the great majority that impose a corporate income tax). This state and federal tax burden might exceed the sum of the foreign tax that a foreign subsidiary would pay and the tax that Iowa collects on dividends received from a foreign subsidiary. But whatever the tax burdens imposed by the Federal Government or by other States, the fact remains that *Iowa* imposes a burden on foreign subsidiaries that it does not impose on domestic subsidiaries.[23] We have no reason to doubt the assertion of the United States that "[i]n evaluating the alleged facial discrimination effected by the Iowa tax, it is not proper to ignore the operation of other provisions of the *same* statute." Brief for United States as Amicus Curiae 14, n. 19 (emphasis added). We find no authority, however, for the principle that discrimination against foreign commerce can be justified if the benefit to domestic subsidiaries might happen to be offset by other taxes imposed not by Iowa, but by other States and by the Federal Government.

---

23 If one were to compare the aggregate tax imposed by Iowa on a unitary business which included a subsidiary doing business throughout the United States (including Iowa) with the aggregate tax imposed by Iowa on a unitary business which included a foreign subsidiary doing business abroad, it would be difficult to say that Iowa discriminates against the business with the foreign subsidiary. Iowa would tax an apportioned share of the domestic subsidiary's entire earnings, but would tax only the amount of the foreign subsidiary's earnings paid as a dividend to the parent. In considering claims of discriminatory

> taxation under the Commerce Clause, however, it is necessary to compare the taxpayers who are "most similarly situated." *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 71, 83 S.Ct. 1201, 1205, 10 L.Ed.2d 202 (1963). A corporation with a subsidiary doing business in Iowa is not situated similarly to a corporation with a subsidiary doing business abroad. In the former case, the Iowa operations of the subsidiary provide an independent basis for taxation not present in the case of the foreign subsidiary. A more appropriate comparison is between corporations whose subsidiaries do not do business in Iowa.

*Kraft*, 505 U.S. at 80–81, 112 S.Ct. 2365 (one footnote omitted).

Appellants refer us to footnote 23 and assert that it instructs that, in the present case, the appropriate comparison to be made is between a Maryland resident and a nonresident as to the amount of Maryland State income tax each pays. Appellants are incorrect. In *Kraft*, Iowa was attempting to argue that its tax system was not discriminatory. In appellants' case, in applying the compensatory tax analysis, we concluded that the SNRT was discriminatory because it imposed a tax on nonresidents that was not imposed on residents. The compensatory tax analysis was not at issue in *Kraft*. It is in applying the compensatory tax analysis that we consider whether the SNRT compensates for the county income tax.

As noted, appellants also rely on *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 83 S.Ct. 1201, 10 L.Ed.2d 202 (1963). There, Halliburton purchased raw materials and semifinished and finished articles for manufacture of the specialized equipment it used in the business of servicing oil wells. *Id.* at 66, 83 S.Ct. 1201. Halliburton manufactured the specialized equipment at its principal place of business in Oklahoma and then shipped some of this equipment to Louisiana. *Id.* at 67, 83 S.Ct. 1201. Halliburton paid Louisiana use taxes upon the value of the raw materials and semifinished and finished articles used in manufacturing the equipment, but did not pay labor and shop overhead expenses attributable to assembling the equipment. *Id.* The Louisiana Collector of Revenue assessed a deficiency. *Id.* If the equipment had been assembled in Louisiana, the labor and shop overhead expenses would not have been taxed. *Id.* In addition, outside of Louisiana, Halliburton purchased oil well cementing service

units in isolated sales that it then transferred to Louisiana and was thus subject to the use tax. *Id.* at 67–68, 83 S.Ct. 1201. If these purchases had been made within Louisiana, they would not have been subject to a sales tax. *Id.* at 68, 83 S.Ct. 1201.

The Supreme Court concluded that "equal treatment for in-state and out-of-state taxpayers similarly situated is the condition precedent for a valid use tax on goods imported from out-of-state." *Id.* at 70, 83 S.Ct. 1201. Nonetheless, Louisiana admitted "[t]he inequality of the Louisiana tax burden between in-state and out-of-state manufacturers-users[.]" *Id.* The Court continued:

> Although the rate is the same, the [Halliburton's] tax base is increased through the inclusion of its product's labor and shop overhead. The Louisiana Supreme Court characterized this discrepancy as incidental. However, equality for the purposes of competition and the flow of commerce is measured in dollars and cents, not legal abstractions. In this case the 'incidental discrepancy'-the labor and shop overhead for the units in dispute-amounts to $1,547,109.70. The use tax rate in Louisiana is 2% and has risen in some States to 4%. The resulting tax inequality is clearly substantial.

> But even accepting this, the Louisiana Supreme Court concluded that the comparison between in-state and out-of-state manufacturer-users is not the proper way to frame the issue of equality. It stated: 'The proper comparison would be between the use tax on the assembled equipment and a sales tax on the same equipment if it were sold.' On the basis of such a comparison, the out-of-state manufacturer-user is on the same tax footing with respect to the item used as the retailer of a similar item, or the competitor who buys from the retailer rather than manufacture his own. However, such a comparison excludes from consideration, without any explanation, the very in-state taxpayer who is most similarly situated to the appellant, the local manufacturer-user. If the Louisiana Legislature were in fact concerned over any tax break the manufacturer-user obtains, it would

surely have made special arrangements to take care of the in-state as well as out-of-state loophole-unless, of course, it intended to discriminate. We can only conclude, therefore, that the proper comparison on the basis of this record is between in-state and out-of-state manufacturer-users. And if this comparison discloses discriminatory effects, it could be ignored only after a showing of adequate justification.

*Id.* at 70–71, 83 S.Ct. 1201 (footnotes omitted).

The Supreme Court went on to "conclude that the Louisiana use tax as applied to the specialized equipment discriminates against interstate commerce." *Id.* at 73, 83 S.Ct. 1201. The Court then considered the isolated sales at issue:

A similar disposition of the tax on the isolated sales follows as a matter of course. The disparate treatment is baldly admitted by the Louisiana Supreme Court: 'The exemption of an isolated sale from the provisions of the sales tax applies strictly to sales within the State of Louisiana; it has no effect whatsoever on any transaction without the state.' The out-of-state isolated sale, it concludes, must therefore be treated 'as if' it were a sale at retail. As the facts of this case indicate, isolated sales involve primarily the acquisition of second-hand equipment from previous users. The effect of the tax is to favor local users who wish to dispose of equipment over out-of-state users similarly situated. Whatever the Louisiana Legislature's reasons for granting such an exemption to this segment of the local second-hand market, no attempt has been made to justify it or to show how its purpose would be defeated by extending the same exemption to similar out-of-state transactions. We therefore conclude that the use tax on isolated sales in this case departs from the equality required by Silas Mason and discriminates against interstate commerce.

*Id.* at 73–74, 83 S.Ct. 1201 (footnotes omitted).

Contrary to appellants' assertion, these cases and *Oregon Waste,* discussed *supra,* do not call for a comparison of the State income tax paid by a resident and a nonresident. Rather, the inquiry is into the Maryland income tax burden im-

posed upon residents as contrasted with nonresidents. As we have repeatedly discussed, nonresidents are not subject to a higher Maryland income tax than residents. The SNRT helps provide governmental services, which benefit the law firm since it is doing business in Maryland. The SNRT is a valid compensatory tax.

## The Equal Protection Clause

■■■ Appellants claim that the SNRT violates the Equal Protection Clause. They state that although they raised this issue below, neither the Tax Court nor the circuit court addressed it. They are incorrect. In the Tax Court's written opinion, it did not provide an in-depth equal protection analysis. Nonetheless, it concluded:

> As to each of the constitutional questions 1—3 [18] posed by the Petitioners in this Appeal, this Court finds that § 10–106.1. serves a rational purpose to create parity in the income tax burdens between Maryland residents and non-residents. There is no extra tax burden that would deter a non-resident from free and open commerce inside or outside the state, and there is no extra tax burden that might be construed to violate the privileges and immunities, and equal protection accorded to everyone. Accordingly, § 10–106.1. does not violate the Interstate Commerce Clause of the United States Constitution, the Equal Protection Clause of the United States Constitution, the Privileges and Immunities Clause of the United States Constitution, or the Maryland Constitution and the Declaration of Rights.

Similarly, the circuit court's written opinion provided:

> As the local/county tax is a component of the Maryland State income tax and the total rate payable by nonresidents does not exceed that paid by residents, it follows that the nonresident tax does not place any increased burden upon nonresidents. Therefore, this tax [the SNRT] is not dis-

---

**18.** Question 1 asked, in part, whether the SNRT violated the Equal Protection Clause of the United States Constitution.

criminatory and does not violated any of the constitutional provisions relied upon by Petitioners.

Appellants claim that taxing schemes that discriminate against nonresident taxpayers violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and, in support of their position, refer us to three cases from the Supreme Court: *Williams v. Vermont,* 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985); *Nordlinger v. Hahn,* 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); and *Fitzgerald v. Racing Ass'n of Central Iowa,* 539 U.S. 103, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003). Appellants assert that "[t]he theme that is running through all of these cases, be they considered under the Interstate Commerce Clause or the Equal Protection Clause, is that there must be a rational basis to impose a different tax scheme on essentially the same category of taxpayers." Appellants contend that there is no rational justification for the State of Maryland to impose a tax on nonresidents with respect to income earned within the State that is greater than that imposed on residents.

In *Williams v. Vermont,* 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985), a new Vermont resident challenged the statute imposing a use tax on motor vehicles. The Supreme Court explained the circumstances under which the use tax was imposed:

> The State of Vermont collects a use tax when cars are registered with it. The tax is not imposed if the car was purchased in Vermont and a sales tax has been paid. The tax is also reduced by the amount of any sales or use tax paid to another State if that State would afford a credit for taxes paid to Vermont in similar circumstances. The credit is available, however, only if the registrant was a Vermont resident at the time he paid the taxes.

*Id.* at 14, 105 S.Ct. 2465. Williams was an Illinois resident when he purchased his car and paid a 5% sales tax. *Id.* at 16, 105 S.Ct. 2465. He moved to Vermont three months later, brought his car with him, and when he registered the vehicle, was charged the use tax. *Id.* He was not granted the tax

credit. *Id.* Williams challenged the denial of the tax credit under the Equal Protection Clause of the Fourteenth Amendment. *Id.*

In considering the validity of the tax credit, the Supreme Court pointed out "that in structuring internal taxation schemes, 'the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.'" *Id.* at 22, 105 S.Ct. 2465 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 359, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973)). The Supreme Court noted that "[i]t has been reluctant to interfere with legislative policy decisions in this area." *Williams*, 472 U.S. at 22, 105 S.Ct. 2465 (citations omitted). Accordingly, an exemption like the Vermont statute at issue "'will be sustained if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose.'" *Id.* at 23, 105 S.Ct. 2465 (quoting *Exxon Corp. v. Eagerton*, 462 U.S. 176, 196, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983)).

The Supreme Court was unable to discern any legitimate purpose furthered by Vermont's "discriminatory exemption." *Williams*, 472 U.S. at 22, 105 S.Ct. 2465. The Court explained:

> In the present case, residence at the time of purchase is a wholly arbitrary basis on which to distinguish among present Vermont registrants-at least among those who used their cars elsewhere before coming to Vermont. Having registered a car in Vermont they are similarly situated for all relevant purposes. Each is a Vermont resident, using a car in Vermont, with an equal obligation to pay for the maintenance and improvement of Vermont's roads. The purposes of the statute would be identically served, and with an identical burden, by taxing each. The distinction between them bears no relation to the statutory purpose.

*Id.* at 23–24, 105 S.Ct. 2465 (footnote and citations omitted).

The case of *Nordlinger v. Hahn*, 505 U.S. 1, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992), arose from a California resident's chal-

lenge under the Equal Protection Clause to the manner in which real property was assessed in that State. As a result of the changes brought by Proposition 13, which was approved by state-wide ballot in 1978, a 1% ceiling was placed on the property tax rate along with a 2% cap on annual increases in assessed valuations. *Id.* at 5, 112 S.Ct. 2326. A change in ownership would trigger a reassessment up to the property's current appraised value. *Id.* Real property was thus "assessed at values related to the value of the property at the time it is acquired by the taxpayer rather than to the value it has in the current real estate market." *Id.* Over time, this system "created dramatic disparities in the taxes paid by persons owning similar pieces of property." *Id.* at 6, 112 S.Ct. 2326. Thus, longer term property owners would pay lower property taxes, which reflected historic property values, while newer owners would pay higher property taxes, which reflected more recent values. *Id.*

In 1989, Nordlinger purchased a residence in Los Angeles County and later learned that she was paying about five times more in property taxes than some of her neighbors who had owned comparable homes since 1975. *Id.* at 7, 112 S.Ct. 2326. She brought an Equal Protection challenge, which was denied in the California courts. *Id.* at 7–9, 112 S.Ct. 2326.

The U.S. Supreme Court applied a rational basis review:

The Equal Protection Clause of the Fourteenth Amendment, § 1, commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." Of course, most laws differentiate in some fashion between classes of persons. The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike.

As a general rule, "legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality." *McGowan v. Maryland,* 366 U.S. 420, 425–26[, 81 S.Ct. 1101, 6 L.Ed.2d 393] (1961). Accordingly, this Court's cases are clear that,

unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest.

*Nordlinger,* 505 U.S. at 10, 112 S.Ct. 2326 (some citations omitted).

The appropriate standard of review was thus "whether the difference in treatment between newer and older owners rationally furthers a legitimate state interest." *Id.* at 11, 112 S.Ct. 2326. The Court added:

In general, the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational. This standard is especially deferential in the context of classifications made by complex tax laws. "[I]n structuring internal taxation schemes 'the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation.'" *Williams v. Vermont,* 472 U.S. 14, 22, 105 S.Ct. 2465, 2471, 86 L.Ed.2d 11 (1985), quoting *Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 359, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973). *See also Regan v. Taxation with Representation of Wash.,* 461 U.S. 540, 547, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) ("Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes").

*Nordlinger,* 505 U.S. at 11, 112 S.Ct. 2326 (some citations omitted).

The Court was able to discern two rationales that justified denying Nordlinger the lower assessment enjoyed by her neighbors:

First, the State has a legitimate interest in local neighborhood preservation, continuity, and stability. The State therefore legitimately can decide to structure its tax system to discourage rapid turnover in ownership of homes and businesses, for example, in order to inhibit displacement of lower income families by the forces of gentrification or of established, "mom-and-pop" businesses by newer chain operations. By permitting older owners to pay progressively less in taxes than new owners of comparable property, the ... assessment scheme rationally furthers this interest.

Second, the State legitimately can conclude that a new owner at the time of acquiring his property does not have the same reliance interest warranting protection against higher taxes as does an existing owner. The State may deny a new owner at the point of purchase the right to "lock in" to the same assessed value as is enjoyed by an existing owner of comparable property, because an existing owner rationally may be thought to have vested expectations in his property or home that are more deserving of protection than the anticipatory expectations of a new owner at the point of purchase. A new owner has full information about the scope of future tax liability before acquiring the property, and if he thinks the future tax burden is too demanding, he can decide not to complete the purchase at all. By contrast, the existing owner, already saddled with his purchase, does not have the option of deciding not to buy his home if taxes become prohibitively high. To meet his tax obligations, he might be forced to sell his home or to divert his income away from the purchase of food, clothing, and other necessities. In short, the State may decide that it is worse to have owned and lost, than never to have owned at all.

*Nordlinger*, 505 U.S. at 12–13, 112 S.Ct. 2326 (citation omitted).

More recently, in *Fitzgerald v. Racing Ass'n of Central Iowa*, 539 U.S. 103, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003), the Supreme Court concluded there was no violation of the Equal Protection Clause when Iowa statutes authorized racetracks to

operate slot machines, but taxed adjusted revenues from the racetrack's slot machines at a maximum rate of 36% while taxing adjusted revenues from slot machines on excursion riverboats at a maximum rate of 20%. *Id.* at 105, 123 S.Ct. 2156. The Court stated that the legislation at issue advanced the racetracks' economic interests:

> Its grant to the racetracks of authority to operate slot machines should help the racetracks economically to some degree-even if its simultaneous imposition of a tax on slot machine adjusted revenues means that the law provides less help than respondents might like. At least a rational legislator might so believe. And the Constitution grants legislators, not courts, broad authority (within the bounds of rationality) to decide whom they wish to help with their tax laws and how much help those laws ought to provide.

*Id.* at 108, 123 S.Ct. 2156. The Court continued:

> Once one realizes that not every provision in a law must share a single objective, one has no difficulty finding the necessary rational support for the 20 percent/36 percent differential here at issue. That difference, harmful to the racetracks, is helpful to the riverboats, which ... were also facing financial peril. These two characterizations are but opposite sides of the same coin. Each reflects a rational way for a legislator to view the matter. And aside from simply aiding the financial position of the riverboats, the legislators may have wanted to encourage the economic development of river communities or to promote riverboat history, say, by providing incentives for riverboats to remain in the State, rather than relocate to other States. Alternatively, they may have wanted to protect the reliance interests of riverboat operators, whose adjusted slot machine revenue had previously been taxed at the 20 percent rate. All these objectives are rational ones, which lower riverboat tax rates could further and which suffice to uphold the different tax rates.

*Fitzgerald,* 539 U.S. at 109, 123 S.Ct. 2156 (citations omitted). Accordingly, the differential tax rate did not violate the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 110,

123 S.Ct. 2156; *see also Wheeler v. Vermont,* 127 Vt. 361, 249 A.2d 887, 891 (1969) (a New Hampshire resident who paid income tax on his Vermont-derived income did not establish an equal protection violation because he did not demonstrate that "his burden is increased over that of a [Vermont] resident in an equivalent income position"); *Reynolds Metal Co. v. Martin,* 269 Ky. 378, 107 S.W.2d 251, 261–62 (there was no equal protection violation when law exempted state banks and trust companies from the imposition of the income tax and provided that individuals who are subject to the income tax did not have to include in their gross income dividends received from stocks held in state banks and trust companies; the importance of encouraging the establishment and continuation of banks, which were the reservoirs of credit that allowed the state, county, and municipal governments to continue functioning, demonstrated a public policy reason for the selection and classification of State banks and trust companies as exempt from income tax; the public policy decision to encourage investment of money in bank stocks so that banks may be organized, enlarged, and refinanced to provide credit to governments also supported the exemption from gross income of individuals of the dividends they received from bank stock), *appeal dismissed,* 302 U.S. 646, 58 S.Ct. 146, 82 L.Ed. 502 (1937).

In the present case, as found by the Tax Court, the SNRT serves the rational purpose of equalizing the income tax burdens between residents and nonresidents. The SNRT also serves the legitimate purpose of helping to pay for government services from which appellants benefit because their law firm does business in the State. The SNRT does not impose an additional tax burden on nonresidents because nonresidents do not pay a higher income tax to the State of Maryland.

### The Privileges and Immunities Clause

The Privileges and Immunities Clause states: "The citizens of each state shall be entitled to all privileges

and immunities of citizens in the several states." U.S. Const. art. IV, § 2.[19]

Appellants contend that the SNRT violates the Privileges and Immunities Clause. They assert that one of the reasons behind the Privileges and Immunities Clause was to avoid tax wars between the states.

Appellants refer us to the 2005 Income Tax Summary Report published by the Comptroller of the Treasury and contend that the report

> addresses "Resident and Non–Resident returns filed for the calendar year 2005 that were received during the State's Fiscal Year ended June 30, 2006 and October 15, 2006 six month deadline." The Report reveals that 53,751 resident income tax returns were filed that sought a credit for taxes paid other states in the amount of $224 million [20] which amount represents about five percent (5%) of the "Net State Tax" of $5.5 billion. Interestingly, the Net State tax paid by Non–Residents was $253 million, about the same as the amount of income tax paid by Maryland residents to other states. If the states that have an income tax decide to impose their own non-resident tax, the amount of taxes paid by Maryland residents to other states will no doubt increase, and this will result in less Net State tax. The ability to claim the credit for income taxes paid other [States] will become greater as the maximum State income tax rate increases from 4.75% to 5.5% for taxable years beginning after December 31, 2007.

Approximately 68% of the $224 million in state income taxes paid other states applies to those residents having

---

**19.** Although the clause addresses "citizens" and appellants' position is based on residency, "it is now established that the terms 'citizen' and 'resident' are 'essentially interchangeable,' for purposes of analysis of most cases under the Privileges and Immunities Clause." *United Bldg. and Const. Trades Council of Camden County and Vicinity v. Mayor and Council of City of Camden*, 465 U.S. 208, 216, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) (citation omitted).

**20.** Appellants note that "[t]he figures are rounded...."

Adjusted Gross Income over $500,000 who will likely be liable for the maximum state tax rate of 5.5%. Whether the other states tax rate is higher or lower than the one in Maryland, the Maryland resident will be able to reduce his Maryland State income tax by the amount of income tax paid the other state to the extent it does not exceed the amount of Maryland income tax calculated on the income subject to tax in other states using the Maryland tax rates. Thus, if the other states increase their income tax rates for non-residents, Maryland will receive less Net State Tax.

This is exactly what the Privileges and Immunities Clause was meant to prevent. As a practical matter, Maryland may regret enacting the SNRT if the other states retaliate. There were 124, 297 Non–Resident returned filed in Maryland, and they paid $253 million in Maryland income tax. These folks may urge their states to take action, particularly those in lower tax jurisdictions like Pennsylvania whose income tax rate is about 3% which denied to its residents a full credit for the income taxes paid to Maryland. [Citations omitted.]

The Privileges and Immunities Clause "is phrased in terms of state citizenship and was designed 'to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned.'" *United Bldg. and Constr. Trades Council of Camden County and Vicinity v. Mayor and Council of City of Camden,* 465 U.S. 208, 215–16, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) (quoting *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1869)). In *Travis v. Yale & Towne Mfg. Co.,* 252 U.S. 60, 40 S.Ct. 228, 64 L.Ed. 460 (1920), the Supreme Court relied on its prior decisions to discuss the purpose of the Privileges and Immunities Clause:

The purpose of the provision came under consideration in *Paul v. Virginia,* [75 U.S. 168,] 8 Wall. 168, 180 (19 L.Ed. 357), where the court, speaking by Mr. Justice Field, said: "It was undoubtedly the object of the clause in question to place the citizens of each state upon the same footing with citizens of other states, so far as the advantages resulting

from citizenship in those states are concerned. It relieves them from the disabilities of alienage in other states; it inhibits discriminating legislation against them by other states; it gives them the right of free ingress into other states, and egress from them; it insures to them in other states the same freedom possessed by the citizens of those states in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other states the equal protection of their laws. It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this." And in *Ward v. Maryland,* [79 U.S. 418] 12 Wall. 418, 430 (20 L.Ed. 449), holding a discriminatory state tax upon nonresident traders to be void, the court, by Mr. Justice Clifford, said: "Beyond doubt those words [privileges and immunities] are words of very comprehensive meaning, but it will be sufficient to say that the clause plainly and unmistakably secures and protects the right of a citizen of one state to pass into any other state of the Union for the purpose of engaging in lawful commerce, trade, or business without molestation; to acquire personal property; to take and hold real estate; to maintain actions in the courts of the state; and to be exempt from any higher taxes or excises than are imposed by the state upon its own citizens."

*Travis,* 252 U.S. at 78, 40 S.Ct. 228; *see also Supreme Court of New Hampshire v. Piper,* 470 U.S. 274, 279, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985) ("the Privileges and Immunities Clause was intended to create a national economic union") (footnote omitted); *Toomer v. Witsell,* 334 U.S. 385, 395, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) ("The primary purpose of [the Privileges and Immunities Clause], like the clauses between which it is located—those relating to full faith and credit and to interstate extradition of fugitives from justice—was to help fuse into one Nation a collection of independent, sovereign States.")

■ Accordingly, "one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of

that State." *Toomer*, 334 U.S. at 396, 68 S.Ct. 1156 (footnote omitted). "Like many other constitutional provisions, the privileges and immunities clause is not an absolute." *Id.* It bars

> discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principal that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures.

*Id.* (footnote omitted). Stated another way, the Privileges and Immunities Clause

> does not preclude discrimination against nonresidents where (i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective. In deciding whether the discrimination bears a close or substantial relationship to the State's objective, the Court has considered the availability of less restrictive means.

*Piper*, 470 U.S. at 284, 105 S.Ct. 1272 (citation and footnote omitted).

In *Travis*, New York State imposed an income tax on nonresidents who earned income in the State. The State also imposed an income tax on residents; however, residents were allowed a $1,000 exemption for a single person, $2,000 for a married person, and an additional $200 for each dependent. *Id.* at 79, 40 S.Ct. 228. A nonresident subject to the income tax was not allowed similar exemptions but

> if liable to an income tax in his own state, including income derived from sources within New York and subject to taxation under this act, he is entitled to a credit upon the income tax otherwise payable to the state of New York by

the same proportion of the tax payable to the state of his residence as his income subject to taxation by the New York act bears to his entire income taxed in his own state:

"Provided, that such credit shall be allowed only if the laws of said state * * * grant a substantially similar credit to residents of this state subject to income tax under such laws."

*Travis*, 252 U.S. at 79, 40 S.Ct. 228 (citation and footnote omitted).

Travis Manufacturing Company employed residents of New Jersey and Connecticut to work in its office in New York City. *Id.* at 80, 40 S.Ct. 228. At that time, New Jersey and Connecticut did not have an income tax. *Id.* Travis Manufacturing's employees from those states did not qualify for the exemptions and the Supreme Court concluded that the New York law violated the Privileges and Immunities Clause:

They [residents of Connecticut and New Jersey] pursue their several occupations side by side with residents of the state of New York-in effect competing with them as to wages, salaries, and other terms of employment. Whether they must pay a tax upon the first $1,000 or $2,000 of income, while their associates and competitors who reside in New York do not, makes a substantial difference. Under the circumstances as disclosed, we are unable to find adequate ground for the discrimination, and are constrained to hold that it is an unwarranted denial to the citizens of Connecticut and New Jersey of the privileges and immunities enjoyed by citizens of New York. This is not a case of occasional or accidental inequality due to circumstances personal to the taxpayer; but a general rule, operating to the disadvantage of all nonresidents including those who are citizens of the neighboring states, and favoring all residents including those who are citizens of the taxing state.

*Travis*, 252 U.S. at 80–81, 40 S.Ct. 228 (citations omitted); *see also Toomer*, 334 U.S. at 396–99, 68 S.Ct. 1156 (statute that required payment of a $25 license fee for each shrimp boat owned by a South Carolina resident and a $2,500 fee for each

shrimp boat owned by a nonresident violated the Privileges and Immunities Clause; the discrimination was so great that it was virtually exclusionary; if South Carolina were allegedly concerned about the size of nonresidents' fishing boats, their fishing techniques, and the added expense of enforcement as applied to nonresidents, the State could restrict the type of equipment used, graduate license fees according to the size of the boats, and charge nonresidents a differential for added enforcement costs or conservation expenditures); *Davis v. Franchise Tax Bd.*, 71 Cal.App.3d 998, 1001–04, 139 Cal.Rptr. 797 (1977) (California's denial of income averaging to nonresidents did not violate the Privileges and Immunities Clause because "nonresident taxpayers' ability to isolate his California income for averaging would provide him more options than a resident taxpayer"; denial of that option to the nonresident was consistent with the state's general policy of ignoring out-of-state income as a factor in progressive taxation; income averaging would give nonresident more opportunities to find a tax bracket ill suited to the state's goal of tax parity, it would permit a nonresident to distort his five-year income history, and deny the state the means of discerning between real and fictitious income fluctuations; thus, these factors provide valid reasons, other than the fact of nonresidency, for denying income averaging to nonresidents).

A New Hampshire commuter tax was at issue in *Austin v. New Hampshire*, 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975). The net effect of the tax's various imposition and exemption features was that no New Hampshire resident was taxed on his out-of-state income. *Id.* at 659, 95 S.Ct. 1191. Nor was a New Hampshire resident taxed on his in-state income. *Id.* Thus, New Hampshire taxed only the incomes of nonresidents working in the state. *Id.* (footnote omitted). The Austins were Maine residents employed in New Hampshire. *Id.* at 657, 95 S.Ct. 1191. They asserted, *inter alia,* that the New Hampshire commuter tax violated the Privileges and Immunities Clause. *Id.*

The Supreme Court first discussed the Privileges and Immunities Clause and the standard of review:

The Privileges and Immunities Clause, by making nonciti-
zenship or nonresidence an improper basis for locating a
special burden, implicates not only the individual's right to
nondiscriminatory treatment but also, perhaps more so, the
structural balance essential to the concept of federalism.
Since nonresidents are not represented in the taxing State's
legislative halls, judicial acquiescence in taxation schemes
that burden them particularly would remit them to such
redress as they could secure through their own State; but
"to prevent (retaliation) was one of the chief ends sought to
be accomplished by the adoption of the Constitution." *Tra-
vis v. Yale & Towne Mfg. Co.*, 252 U.S. 60, 82, 40 S.Ct. 228,
64 L.Ed. 460 (1920). Our prior cases, therefore, reflect an
appropriately heightened concern for the integrity of the
Privileges and Immunities Clause by erecting a standard of
review substantially more rigorous than that applied to
state tax distinctions among, say forms of business organiza-
tions or different trades and professions.

*Austin,* 420 U.S. at 662–63, 95 S.Ct. 1191 (one citation and
footnote omitted).

The Supreme Court stated that its prior cases had estab-
lished "a rule of substantial equality of treatment for the
citizens of the taxing State and nonresident taxpayers[.]" *Id.*
at 665, 95 S.Ct. 1191. As a result, "[t]he overwhelming fact, as
the State [New Hampshire] concedes, is that the tax falls
exclusively on the income of nonresidents; and it is not offset
even approximately by other taxes imposed upon residents
alone." *Id.* (footnote omitted). The Court explained:

[T]he argument advanced in favor of the tax is that the
ultimate burden it imposes is "not more onerous in effect,"
*Shaffer v. Carter, supra,* on nonresidents because their total
state tax liability is unchanged once the tax credit they
receive from their State of residence is taken into account.
While this argument has an initial appeal it cannot be
squared with the underlying policy of comity to which the
Privileges and Immunities Clause commits us.

According to the State's theory of the case, the only
practical effect of the tax is to divert to New Hampshire tax

revenues that would otherwise be paid to Maine, an effect entirely within Maine's power to terminate by repeal of its credit provision for income taxes paid to another State. The Maine Legislature could do this, presumably, by amending the provision so as to deny a credit for taxes paid to New Hampshire while retaining it for the other 48 States. Putting aside the acceptability of such a scheme, and the relevance of any increase in appellants' home state taxes that the diversionary effect is said to have, we do not think the possibility that Maine could shield its residents from New Hampshire's tax cures the constitutional defect of the discrimination in that tax. In fact, it compounds it. For New Hampshire in effect invites appellants to induce their representatives, if they can, to retaliate against it.

*Austin,* 420 U.S. at 666–67, 95 S.Ct. 1191 (one citation and footnotes omitted).

We believe that *Travelers' Ins. Co. v. Connecticut,* 185 U.S. 364, 22 S.Ct. 673, 46 L.Ed. 949 (1902), bears on the present case. At issue in *Travelers'* was a Connecticut tax levied on the value of stock in local insurance corporations. *Id.* at 364–65, 22 S.Ct. 673. The shares owned by nonresident stockholders were assessed at their market value, while the shares owned by resident stockholders were assessed at their market value less the proportionate value of all real estate held by the corporation on which the corporation had already paid property tax. *Id.* at 366, 22 S.Ct. 673. There appeared to be wrongful discrimination because the nonresident stockholder was subject to a larger tax burden than the resident stockholder. *Id.* at 366–67, 22 S.Ct. 673. The discrimination disappeared when the Supreme Court considered "the system of taxation prevailing in Connecticut[.]" *Id.* at 367, 22 S.Ct. 673. The Court wrote:

By that system the nonresident stockholder pays no local taxes. He simply pays a state tax, contributes so much to the general expenses of the state. While, on the other hand, the resident stockholder pays no tax to the state, but only to the municipality in which he resides. In other words, the state imposes no direct taxes for its benefit upon

the property belonging to residents, but collects its entire revenue from corporations, licenses, etc.

\* \* \*

In other words, the state, dealing with the question of taxation of the shares of stock in a local corporation, found two classes; one, shares held by residents, and the other, those held by nonresidents. It was believed that a resident in a city or town, enjoying all the benefits of local government, should be taxed for the expenses of that government upon all the property he possessed, whether that property consisted in part or in whole of shares of stock. On the other hand, the nonresident, enjoying little or none of the benefits of local government, was exempted from taxation on account of the expenses of such local government. At the same time it was not right that he should escape all contribution to the support of the state which created and protected the corporation and the property of all its stockholders, and so a tax was cast upon the nonresident stockholder for the expenses of the state. This, with kindred taxes, has been found sufficient to pay the running expenses of the state government. The resident is not called upon to pay any of the expenses of the state, but only to bear his proportional share of those of the municipality. The nonresident is called upon to pay no share of the expenses of the municipality, but only to contribute to the support of the state.

*Travelers'*, 185 U.S. at 367–69, 22 S.Ct. 673.

Further, although residents paid local property taxes at an average rate approximating or exceeding the rate imposed by the State on nonresidents, the Supreme Court upheld the scheme because

"[a]bsolute equality in taxation can never be attained. That system is the best which comes the nearest to it. The same rules cannot be applied to the listing and valuation of all kinds of property. Railroads, banks, partnerships, manufacturing associations, telegraph companies, and each one of

the numerous other agencies of business which the inventions of the age are constantly bringing into existence, require different machinery for the purposes of their taxation. The object should be to place the burden so that it will bear as nearly as possible equally upon all. For this purpose different systems adjusted with reference to the valuation of different kinds of property are adopted. The courts permit this."

*Travelers',* 185 U.S. at 371–72, 22 S.Ct. 673 (quoting *Tappan v. Merchants' Nat'l Bank of Chicago,* 86 U.S. (19 Wall.) 490, 504, 22 L.Ed. 189 (1873)); *see also Lunding v. New York Tax Appeals Tribunal,* 522 U.S. 287, 297, 118 S.Ct. 766, 139 L.Ed.2d 717 (1998) ("as a practical matter, the Privileges and Immunities Clause affords no assurance of precise equality in taxation between residents and nonresidents of a particular State"); *St. Louis Southwestern Ry. Co. v. Arkansas,* 235 U.S. 350, 362, 35 S.Ct. 99, 59 L.Ed. 265 (1914) ("[W]hen the question is whether a tax imposed by a state deprives a party of rights secured by the Federal Constitution, the decision is not dependent upon the form in which the taxing scheme is cast, nor upon the characterization of that scheme as adopted by the state court. We must regard the substance, rather than the form, and the controlling test is to be found in the operation and effect of the law as applied and enforced by the state.") (Citations omitted); *Barney v. State Tax Assessor,* 490 A.2d 223, 225 (Me.1985) (Maine's pro-ration of exemptions and deductions based on percentage of nonresident's Maine income did not violate the Privileges and Immunities Clause; "Maine's approach does not impose a greater burden on nonresidents as a class, nor on any single taxpayer because he is not a resident").

Thus, the SNRT places nonresidents and residents on an equal footing because nonresidents pay no more Maryland income tax than residents. Although the SNRT is imposed only on nonresidents, residents also pay the county income tax. There is no violation of the Privileges and Immunities Clause.

### The Maryland Constitution and Declaration of Rights

Appellants claim that because the SNRT discriminates against nonresidents, it violates the equal protection mandate of Article 24 of the Declaration of Rights and the Maryland Constitution. They assert that in accordance with *Frankel v. Board of Regents*, 361 Md. 298, 761 A.2d 324 (2000), appellee must justify the disparate Maryland State income tax rates for residents and nonresidents. Appellants contend that there is no reasonable justification for the discrimination against the nonresidents and that the SNRT is thus unconstitutional.

Article 24 of the Maryland Declaration of Rights states:

That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Article 24 does not contain an express equal protection clause, but the Court of Appeals "has held that the concept of equal protection is embodied within the Article." *Neifert v. Dep't of Env't*, 395 Md. 486, 504, 910 A.2d 1100 (2006); *see also Attorney General of Maryland v. Waldron*, 289 Md. 683, 704, 426 A.2d 929 (1981) ("Although the Maryland Constitution contains no express equal protection clause, we deem it settled that this concept of equal treatment is embodied in the due process requirement of Article 24 of the Declaration of Rights.") (Footnote omitted).

In *Dua v. Comcast Cable of Maryland, Inc.*, 370 Md. 604, 621–22, 805 A.2d 1061 (2002), Judge Eldridge explained the relationship between the state constitutional provisions and those in the federal constitution:

We have often commented that such state constitutional provisions are *in pari materia* with their federal counterparts or are the equivalent of federal constitutional provisions or *generally* should be interpreted in the same manner as federal provisions. Nevertheless, we have also emphasized that, simply because a Maryland constitutional provi-

sion is *in pari materia* with a federal one or has a federal counterpart, does *not* mean that the provision will *always* be interpreted or applied in the same manner as its federal counterpart. Furthermore, cases interpreting and applying a federal constitutional provision are only persuasive authority with respect to the similar Maryland provision.

Thus, in *Attorney General v. Waldron*, 289 Md. 683, 714, 426 A.2d 929 (1981), Judge Digges for the Court, referring to the equal protection component of Article 24 of the Declaration of Rights and the Equal Protection Clause of the Fourteenth Amendment, stated:

> "Although the equal protection clause of the fourteenth amendment and the equal protection principle embodied in Article 24 are 'in pari materia,' and decisions applying one provision are persuasive authority in cases involving the other, we reiterate that each provision is independent, and a violation of one is not necessarily a violation of the other.

> \* \* \*

> "Nevertheless, because the State equal protection principle is possessed of independent animation, in [some] circumstances the application of Article 24 of the Maryland Declaration of Rights may require a result at variance with the Supreme Court's application of the fourteenth amendment's equal protection clause."

*See also Ehrlich v. Perez*, 394 Md. 691, 715–16, 908 A.2d 1220 (2006) ("Article 24 and the Equal Protection Clause of the Fourteenth Amendment are in pari materia, and we generally apply them in like manner and to the same extent. Although the two are capable of divergent application, '[w]e have, however, long recognized that decisions of the [U.S.] Supreme Court interpreting the equal protection clause of the federal constitution are persuasive authority in cases involving the equal treatment provisions of Article 24.'") (Quoting *Hornbeck v. Somerset County Bd. of Educ.*, 295 Md. 597, 640, 458 A.2d 758 (1983)) (some citations omitted).

*Frankel v. Board of Regents of the Univ. of Maryland Sys.*, 361 Md. 298, 761 A.2d 324 (2000), involved the residency classification of a student, Frankel, at the University of Maryland, College Park, for purposes of tuition. Students who qualified for in-state status paid lower tuition fees than those classified with out-of-state status. *Id.* at 301, 761 A.2d 324. The Court of Appeals explained the University's Policy for determining a student's residency classification:

Under the Policy, a student's "residency classification" is initially dependent upon the source of his or her financial support. A student who is "financially independent" is given the opportunity to prove bona fide state residence based on eight traditional domicile factors, set forth in Part I, subpart A of the Policy, such as place of residence, voter registration, property ownership, the state to which income taxes are paid, driver's license, motor vehicle registration, etc. A student who is "financially dependent," however, is precluded from presenting evidence relating to his or her own permanent residence. Instead, the permanent residence of the financially dependent student is deemed to be the same as that of the individual or individuals who provide the monetary support. A "financially dependent student" is defined under the Policy as either

"one who is claimed as a dependent for tax purposes, or [one] who receives more than one-half of his or her support from a parent, legal guardian, or spouse during the twelve (12) month period immediately prior to the last published date for registration for the semester or session."

A "financially independent student," on the other hand, is one who is not a dependent for tax purposes, receives less than one-half his or her support "from any other person or persons," and "demonstrates that he or she provides through self-support one-half or more of his or her total expenses."

*Id.* at 302–03, 761 A.2d 324 (citations and footnote omitted). The Court added:

Under the provisions of the Board's Policy, as reaffirmed during oral argument before this Court, a student at the University of Maryland, College Park, cannot have in-state tuition status if more than one-half of the student's financial support comes from a person or persons who live out-of-state. This requirement is absolute and has no exceptions. Furthermore, as emphasized by the Board at oral argument before us, the relationship between the student and the out-of-state benefactor is immaterial. Although in the present case the benefactor may be an out-of-state parent, the out-of-state monetary source could be a grandparent, a distant relative, a family friend, or any other out-of-state benefactor, and the student will still be deemed a nonresident. A student who is a Maryland resident under any legal meaning or ordinary usage of the term "resident," but whose chief source of monetary support is someone out-of-state, will, under the Policy, be deemed a nonresident of Maryland and will be required to pay a greater tuition than other Marylanders. Therefore the Policy, *inter alia*, places in one class bona fide Maryland residents whose primary source of funds is within the State, and places in another, higher paying class, bona fide Maryland residents whose primary source of funds is outside the State.

*Id.* at 314, 761 A.2d 324.

In September 1994, Frankel enrolled at the University of Maryland, College Park. *Id.* at 304, 761 A.2d 324. For the four years he attended school there, he lived year-round in College Park. *Id.* Frankel was a registered Maryland voter, worked part-time, paid Maryland income tax, and had a Maryland driver's license. *Id.* Initially, Frankel did not seek in-state classification for tuition purposes and listed his residence as that of his father in Washington, D.C. *Id.* His mother resided in Rhode Island. *Id.* Following his second year at College Park, Frankel sought in-state classification for tuition. *Id.* at 305, 761 A.2d 324. Frankel was denied in-state status. *Id.* The "Residency Classification Office" informed him he was denied in-state status because he did not demon-

strate that "he financed through self-support one-half or more of his total expenses." *Id.*

After exhausting his administrative appeals, Frankel filed a complaint for declaratory judgment in the Circuit Court for Montgomery County and, *inter alia,* asked the circuit court to declare that "the Policy's nonresidency presumption, based on financial dependency, was in violation of [his] rights to due process and equal protection of the laws and thus was unconstitutional." *Id.* The circuit court found that the decision to classify Frankel as financially dependent was "not arbitrary and capricious, illegal, or unreasonable." *Id.* The court also concluded that the Policy did not violate Frankel's "right to equal protection of the law because the distinction 'between a financially independent student whose residence is considered for in-state status, and a financially dependent student whose residence is not considered, is certainly a distinction that has a rational basis.'" *Id.* at 305–06, 761 A.2d 324. This Court affirmed. *Id.* at 306, 761 A.2d 324.

The Court of Appeals noted that "[e]ven under the 'minimal' rational basis test" it had " 'not hesitated to strike down discriminatory economic regulation that lacked any reasonable justification.'" *Id.* at 315, 761 A.2d 324 (quoting *Maryland Aggregates v. State,* 337 Md. 658, 673, 655 A.2d 886 (1995)). The Court stated that "such invalid regulations have often 'imposed economic burdens, in a manner tending to favor [some Maryland] residents . . . over [other Maryland] residents . . . .'" *Id.* (quoting *Maryland Aggregates,* 337 Md. at 672 n. 9, 655 A.2d 886). The Court then explained that "a governmental regulation placing a greater burden on some Marylanders than on others based on geographical factors must 'rest upon "some ground of difference having a fair and substantial relation to the object of the" ' regulation." *Id.* at 317, 761 A.2d 324 (quoting *Verzi v. Baltimore County,* 333 Md. 411, 419, 635 A.2d 967 (1994)).

The Board of Regents' stated Policy was "to allow bona fide Maryland residents to pay a lower tuition than nonresidents." *Id.* The Board insisted that "whether one receives his or her

primary monetary support from persons inside of the State or from out-of-state is 'probative' of his or her permanent residence." *Id.* Frankel did not challenge this objective and the Court of Appeals assumed that it was "entirely legitimate." *Id.* Nonetheless, the Court concluded that "the Board's absolute preclusion of resident status for any student whose primary source of monetary support resides out-of-state has no 'fair and substantial relation to' the Board's and Policy's objective." *Id.* The Court described a few hypothetical situations in which applications of the Policy would be inconsistent with providing a tuition benefit to a bona fide Maryland Resident. *Id.* In one example, the Court envisioned a student, born and raised in Maryland, who, after the student's parents divorced, continued to reside in Maryland with one parent while the other parent moved to another state. *Id.* The student, a bona fide Maryland resident, would have to pay out-of-state tuition if the out-of-state parent provided the monetary support while the student attended the University of Maryland. *Id.* Thus, the Policy had "little relation to the stated objective of benefitting bona fide Maryland residents." *Id.* at 318, 761 A.2d 324. The Court of Appeals concluded:

> [T]he Board's and the Policy's use of "financial dependence" and "financial independence" creates an arbitrary and irrational classification which violates the equal protection principle embodied in Article 24 of the Maryland Declaration of Rights. The petitioner is entitled to have his residency classification determined by the University based on the eight "domicile" criteria set forth in Part I, subpart A, of the Policy, and without using the "financial dependence" and "financial independence" factors.

*Id.* (footnote omitted).

In the present case, the SNRT bears a fair and substantial relationship to the goal of requiring out-of-state residents to pay for governmental services. It does not impose a higher Maryland State income tax rate on nonresidents. The SNRT does not violate Article 24 of the Maryland Declaration of Rights of the Maryland Constitution.

### Waiver of Interest

■ Appellee assessed appellants for their failure to pay the SNRT. The assessments included penalties and interest. The hearing officer affirmed the assessments. The Tax Court abated the penalty assessments, but affirmed all others. Regarding the abatement of penalties, the Tax Court determined that "the Appeal was taken in good faith without any intent to avoid or delay the proper payment of all taxes legitimately owed. Accordingly, penalties are hereby abated with respect to all Petitioners in this case." In regard to the abatement of interest, the Tax Court concluded that it "does not have the authority to abate interest."

The circuit court disagreed and wrote:

Petitioners requested the Tax Court to abate interest and penalties on the unpaid taxes arguing that their refusal to pay was based upon a good faith belief that the statutory provision discussed above was unconstitutional. The Tax Court abated the penalties, apparently agreeing that the Petitioners had a reasonable basis for challenging the law and that they were acting in good faith. Its decision was premised on § 13–714, entitled Waiver of Penalty. However, the Tax Court concluded that it lacked authority to abate interest.

Section 13–606, entitled Waiver of Interest, provides that "[f]or reasonable cause, a tax collector may waive interest on unpaid tax." This section parallels 13–714 and clearly authorizes the abatement of interest in the appropriate circumstances. The Tax Court erroneously concluded that it did not have authority to waive interest, and declined to exercise its discretion in this regard.

While the Court has the power to determine *de novo* a question of law, this Court may not rule on a discretionary matter in the first instance. Accordingly, the case will be remanded to the Tax Court for consideration of waiver of interest under Section 13–606. If this Court had the authority to make the decision regarding abatement of interest, the Court would be inclined to waive interest on the

unpaid tax. This Court finds that the issues raised by Petitioners are substantial, and that they pursued this matter in good faith and with reasonable care.

Appellants contend that since the Tax Court had determined that they met the test for abatement of penalties, which, they claim, is the same test for the waiver of interest, the circuit court, instead of remanding the case to the Tax Court on the question of the waiver of interest, should have included in its Order that the interest was waived. Accordingly, appellants assert that the circuit court should have waived the interest and not remanded the case to the Tax Court for consideration of that issue.

Appellee, in its cross-appeal, contends that the circuit court erred in concluding that the Tax Court had authority to modify or eliminate interest. Appellee claims that interest is required under T.G. § 13–601(a) and that no statute grants the Tax Court authority to reduce or modify interest. Appellee also states that the Tax Court, which is an administrative agency, has not been granted the authority to exercise the judicial function of discretion. According to appellee, once it levies an assessment, the Tax Court cannot reduce the assessment on grounds of fairness or hardship. The Tax Court, appellee continues, may only find facts that increase or decrease an assessment, such as, "the amount of income or deduction, the value of property, the actual amount of a sale subject to a tax, or whether an individual is domiciled in the state." Appellee claims that once the Tax Court finds such facts, "the adjustment to the assessment follows as a matter of course." Appellee also refers us to several cases in the federal courts in support of the "principle of limited authority over interest[.]" Appellee claims that these cases hold that unless there is an express statutory grant of authority, the United States Tax Court nor the federal courts can abate or reduce an obligation to pay interest on the tax.

On appeal, we review only the decisions of the Tax Court. We thus consider whether the Tax Court erred in concluding that it did not have authority to abate interest, which requires

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

us to interpret the various sections of the Tax–General Article. Accordingly, we begin with a discussion of the rules of statutory interpretation.

▮▮▮▮▮▮▮ "The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature." *Comptroller of Treasury v. Phillips,* 384 Md. 583, 591, 865 A.2d 590 (2005). "The words actually used in the statute, and their 'plain meaning' are the best indicator of that intent." *State Dep't of Assessments and Taxation v. Maryland–Nat'l Capital Park and Planning Comm'n,* 348 Md. 2, 11 n. 9, 702 A.2d 690 (1997). "[W]e view the words of a statute in ordinary terms, in their natural meaning, in the manner in which they are most commonly understood." *Derry v. State,* 358 Md. 325, 335, 748 A.2d 478 (2000) (citations omitted); *see also Deville v. State,* 383 Md. 217, 223, 858 A.2d 484 (2004) ("Ordinary and popular understanding of the English language dictates interpretation of terminology within legislation.") (Citation omitted). "If the words of a statute are clear and unambiguous, our inquiry ordinarily ends and we need investigate no further, but simply apply the statute as it reads." *Gillespie v. State,* 370 Md. 219, 222, 804 A.2d 426 (2002) (citation omitted). In *Chow v. State,* 393 Md. 431, 903 A.2d 388 (2006), the Court of Appeals explained:

> "In construing the plain language, '[a] court may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application.' *Price v. State,* 378 Md. 378, 387, 835 A.2d 1221 (2003); *County Council v. Dutcher,* 365 Md. 399, 416–17, 780 A.2d 1137 (2001). Statutory text ' "should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory." ' " *[Collins v. State,* 383 Md. 684, 691, 861 A.2d 727 (2004) ] (quoting *James v. Butler,* 378 Md. 683, 696, 838 A.2d 1180 (2003)). The plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given

effect. *Deville,* 383 Md. at 223, 858 A.2d 484; *Navarro-Monzo v. Washington Adventist,* 380 Md. 195, 204, 844 A.2d 406 (2004).

*Id.* at 443, 903 A.2d 388 (quoting *Kushell v. Dept. of Natural Res.,* 385 Md. 563, 576–77, 870 A.2d 186 (2005)); *see also Smack v. Dep't of Health & Mental Hygiene,* 378 Md. 298, 305, 835 A.2d 1175 (2003) ("the statute must be given a reasonable interpretation, 'not one that is illogical or incompatible with common sense' ") (quoting *Whiting–Turner Contracting Co. v. Fitzpatrick,* 366 Md. 295, 302, 783 A.2d 667 (2001)).

 "If a statute has more than one reasonable interpretation, it is ambiguous." *Twine v. State,* 395 Md. 539, 550, 910 A.2d 1132 (2006) (citation omitted); *see also Price v. State,* 378 Md. 378, 387, 835 A.2d 1221 (2003) ("[B]efore judges may look to other sources for interpretation, first there must exist an ambiguity within the statute, i.e., two or more reasonable alternative interpretations of the statute.") When "the statutory language is ambiguous, we resolve that ambiguity in light of the legislative intent, considering the legislative history, case law, and statutory purpose." *Moore v. State,* 388 Md. 446, 453, 879 A.2d 1111 (2005) (citation omitted).

After a taxpayer files a tax return, "if a tax collector examines or audits a return and determines that the tax due exceeds the amount shown on the return, the tax collector shall assess the deficiency." T.G. § 13–401. "Tax collector" is defined in T.G. § 13–101(c), which provides:

(c) *Tax collector.*—(1) "Tax collector" means the person or governmental unit responsible for collecting a tax.

(2) "Tax collector" includes:

(i) the Comptroller;

(ii) the Department, with respect to:

1. the financial institution franchise tax; and

2. the public service company franchise tax; and

(iii) the registers of wills, with respect to the inheritance tax.

A tax collector is required to mail notice of the assessment to the person against whom the assessment is made. T.G. § 13–410. An assessment of tax made under the Tax–General Article "is prima facie correct." T.G. § 13–411. Under T.G. § 13–413(a), "[i]nterest, penalties, and collection fees shall be assessed and collected in the same manner as a tax." Further, if a person fails to pay a tax imposed under the Tax–General Article, "the tax collector shall assess interest on the unpaid tax from the due date to the date on which the tax is paid." T.G. § 13–601(a). Waiver of interest is provided for under T.G. § 13–606, which states: "For reasonable cause, a tax collector may waive interest on unpaid tax." The tax collector is also required to assess a penalty on an unpaid tax. *See* T.G. § 13–701 ("Except as otherwise provided in this subtitle, if a person or governmental unit fails to pay a tax when due under this article, the tax collector shall assess a penalty not exceeding 10% of the unpaid tax.") Nonetheless, the tax collector is also authorized to waive a penalty. *See* T.G. § 13–714 ("For reasonable cause, a tax collector may waive a penalty under this subtitle.")

An individual aggrieved by the action in the notice may appeal to the Tax Court[21] from "a final assessment of tax, interest, or penalty...." T.G. §§ 13–510(a)(1). The Tax Court "is an independent administrative unit of the State government." T.G. § 3–102. It's jurisdiction is set forth in T.G. § 3–103(a), which states:

(a) *In general.*—The Tax Court has jurisdiction to hear appeals from the final decision, final determination, or final order of a property tax assessment appeal board or any other unit of the State government or of a political subdivision of the State that is authorized to make the final decision or determination or issue the final order about any tax issue, including:

(1) the valuation, assessment, or classification of property;

---

21. The individual must first exhaust administrative remedies, T.G. 13–514, but those remedies are not at issue in this case.

(2) the imposition of a tax;

(3) the determination of a claim for refund;

(4) the application for an abatement, reduction, or revision of any assessment or tax; or

(5) the application for an exemption from any assessment or tax.

■ The appeal before the Tax Court "shall be heard de novo and conducted in a manner similar to a proceeding in a court of general jurisdiction sitting without a jury." T.G. § 13–523. "The burden is upon the taxpayer to show error in the assessment." *Comptroller of the Treasury v. Clise Coal, Inc.*, 173 Md.App. 689, 698, 920 A.2d 561 (2007) (citations omitted). Further, the Tax Court "is not bound by the technical rules of evidence." T.G. § 13–525.

Finally, the Tax Court's powers are limited as provided in T.G. § 13–528:

(a) *Powers.*—(1) The Tax Court shall have full power to hear, try, determine, or remand any matter before it.

(2) In exercising these powers, the Tax Court may reassess or reclassify, abate, modify, change or alter any valuation, assessment, classification, tax or final order appealed to the Tax Court.

(b) *Limitation on powers.*—Absent affirmative evidence in support of the relief being sought or an error apparent on the face of the proceeding from which the appeal is taken, the decision, determination, or order from which the appeal is taken shall be affirmed.

In the present case, appellee's position that the Tax Court may not abate interest would render parts of the statutory scheme a nullity. Although assessment of interest is required, T.G. § 13–601(a), the tax collector may, under T.G. § 13–606 waive interest. The tax collector, *i.e.*, the Comptroller, is thus granted authority to waive the interest, but this does not mean that authority over an assessment of interest is confined solely to the tax collector. The plain language of T.G. § 13–510(a)(1) allows for an appeal to the Tax Court from "a final assessment

of tax, interest, or penalty. . . ." In addition, T.G. § 3–103(a)(4) grants the Tax Court jurisdiction to hear appeals concerning "the application for an abatement, reduction, or revision of any assessment or tax. . . ." Finally, the Tax Court is granted the power to "reassess or reclassify, abate, modify, change or alter any valuation, assessment, classification, tax or final order appealed to the Tax Court." T.G. § 13–528(a). Accordingly, the Tax Court may consider the assessment of interest if that the party appealing raises that issue.

Appellees are correct that the Tax Court is an administrative body. Nonetheless, it acts in a quasi-judicial capacity. *See Maryland Aggregates v. State,* 337 Md. 658, 678, 655 A.2d 886, 896 (1995) (an administrative "agency in the executive branch may ordinarily perform adjudicatory functions in harmony with the principle of separation of powers provided that there is an opportunity for judicial review of the agency's final determination"); *Shell Oil Co. v. Supervisor of Assessments of Prince George's County,* 276 Md. 36, 46, 47, 343 A.2d 521 (1975) (Article 8 of the Maryland Constitution "prohibits the courts from performing non-judicial functions and prohibits administrative agencies from performing judicial functions"; "[T]he Legislature has delegated certain duties to the Tax Court, the performance of which requires it to make factual determinations and adjudicate disputes. The Tax Court, therefore, can be said to act in a quasi-judicial capacity. . . . [T]he Legislature may within limits delegate quasi-judicial functions to an administrative agency, and the delegation of these functions is not the delegation of a judicial function or judicial authority.") An individual may appeal from assessment of interest and it would render the T.G. § 13–510(a)(1) a nullity and mere surplusage to conclude otherwise.

We also note that appellee refers us to federal case law, but the plain language of the applicable sections in the Tax–General Article lead to the conclusion that the Tax Court has authority to abate interest. We thus remand the case to the Tax Court for consideration of the abatement of interest.

## Conclusion

The SNRT does not violate the Commerce Clause, the Equal Protection Clause, or the Privileges and Immunities Clause of the United States Constitution. Nor does the SNRT violated Article 24 of the Declaration of Rights of the Maryland Constitution.

The Tax Court has authority to consider the abatement of interest. Accordingly, we remand this case to the Tax Court for consideration of that issue.

**JUDGMENT OF THE TAX COURT THAT IT HAD NO AUTHORITY TO ABATE INTEREST ASSESSMENT RE-VERSED; CASE REMANDED TO TAX COURT FOR CONSIDERATION OF ABATEMENT OF INTEREST AS-SESSMENT. ALL OTHER JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID THREE-FOURTHS BY APPEL-LANTS AND ONE-FOURTH BY APPELLEE.**